**Daniel S. RIORDAN, Plaintiff,**

v.

**CITY OF JOLIET, et al., Defendants.**

**No. 96 C 8400.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 4, 1998.

P. Matthew Glavin, Glavin & Associates, Chicago, IL, for Plaintiff.

James G. Sotos, Hervas, Sotos, Condon & Bersani, P.C., Itasca, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Daniel Riordan ("Riordan") initially sued City of Joliet ("Joliet"), its Police Officers Joseph Seme ("Seme") and Michael Knowski ("Knowski") (collectively "Officers") and private corporation Sports Center, Inc. ("Cen-

ter") under 42 U.S.C. § 1983 ("Section 1983") and Illinois state law. This Court's April 24, 1998 memorandum opinion and order dismissed Riordan's state law claims against Joliet and Officers (Counts IV, V, VI and VII). Riordan has since dismissed his claims against Center. Riordan's remaining Section 1983 claims charge Officers with violating his substantive due process rights guaranteed by the Fourteenth Amendment by releasing him from custody into a dangerous situation and charge Joliet with municipal liability for its policies under which Officers violated Riordan's civil rights.

Joliet and Officers now move for summary judgment under Fed.R.Civ.P. ("Rule") 56 as to all of Riordan's surviving claims. Riordan has responded with a cross-motion for summary judgment. Each party has complied with this District Court's General Rule ("GR") 12(M) and 12(N),[1] which has been adopted to highlight the existence or nonexistence of any material fact disputes, and both party's motions are fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, each side's motion is denied as to Riordan's surviving Section 1983 claims except as stated in n. 2.[2]

### Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N.*

*Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). Where as here cross-motions for summary judgment are involved, it is necessary to adopt a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions. Such is the case here, for each party has shown that genuine issues of material fact remain that must be addressed before Riordan's surviving claims may be resolved.

### Facts

On December 27, 1995 Riordan was 48 years old and lived at the Sports Center, a long-term residential hotel for men in Joliet, Illinois (R. 12(M) ¶ 3). Riordan had rented his room at Sports Center on a weekly basis since August 31, 1995, and he had prepaid his $65 rent for the December week in question (*id.* ¶ 8).

At 1 p.m. December 27 Riordan purchased a pint of vodka and a pack of cigarettes at a liquor store (J. 12(M) ¶ 10). He returned to his room at the Sports Center and began drinking and smoking. That is the last thing Riordan remembers until December 30, when he woke up at Silver Cross Hospital (J. 12(M) ¶ 12). Necessarily, then, the following narrative relies on accounts from other eyewitnesses.

Shortly before 8:30 p.m. on December 27, Sports Center's manager Arthur Morris ("Morris") received a complaint that someone was urinating in the fifth floor phone booth. Morris investigated the complaint and found Riordan exposing himself and "hollering" into the phone (Morris Dep. 12–13). Morris also noticed that Riordan's breath smelled of

---

**1.** Joliet and Officers are represented by the same counsel and have jointly filed all their submissions. For convenience this opinion refers to their combined GR 12(M) statements as "J. 12(M) ¶___," while citing to Riordan's 12(M) statements as "R. 12(M) ¶___". Unless otherwise noted, each cited statement has either been explicitly or implicitly admitted in the corresponding response. Those same "J." and "R." abbreviations will be employed for the parties' other filings.

**2.** Riordan's original Complaint included Section 1983 charges against Officers for unlawful arrest and conspiracy to violate Riordan's constitutional rights and against Joliet for failure to train its

police officers and conspiracy, but Riordan has presented no argument in support of those potential claims in opposition to Officers' and Joliet's Rule 56 motion. Because the burden of proof on all his claims is Riordan's, his failure to argue those claims is fatal, for "[i]f the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact" (*Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir.1998), quoting *Sample v. Aldi*, 61 F.3d 544, 547 (7th Cir.1995)). Riordan's unargued Section 1983 claims are therefore dismissed with prejudice, and the rest of this opinion deals only with the argued claims.

alcohol and that he needed to lean against the wall to stand up (R. 12(M) ¶ 13). In fact, at that point Riordan was highly intoxicated, with an astonishingly elevated blood/alcohol level of approximately .427 (*id.* ¶ 42). Riordan refused to return to his room, even after Morris threatened to call the police.

Morris went back to the lobby and called the Joliet Police Department at 8:31 p.m. (J. 12(M) ¶¶ 30–31). Both Officers were assigned the call and proceeded promptly to the Sports Center. In the lobby Morris told Seme that Riordan was drunk and refused to go to his room (*id.* ¶¶ 34–35). Morris also said that Riordan had previously broken numerous Sports Center rules and that Morris wanted Riordan out of there (*id.* ¶¶ 35–36). Then Morris led Officers to the fifth floor and found that Riordan was still next to the phone booth.

Officers quickly recognized that Riordan was drunk. He had alcohol on his breath, bloodshot eyes, a red face and slurred speech (*id.* ¶¶ 39–40). Riordan again adamantly refused Morris' request that he return to his room or leave the building, so each of Seme and Knowski took one of Riordan's elbows, and they half-walked, half-propelled Riordan back to his rented room (*id.* ¶ 50; Morris Dep. 26).

Once they reached Riordan's room, Officers gathered Riordan's possessions and tried to get him ready to go outside. Riordan was wearing only a t-shirt, jeans and a corduroy jacket (R. 12(M) ¶ 56). Knowski told Riordan that it was "freezing" outside and tried to get Riordan to put on more clothes, but Riordan refused to cooperate (*id.* ¶ 48). Eventually Knowski tried several times to put Riordan's shoes on for him, but each time Riordan kicked them off, while swearing and telling the officer he did not need his shoes (Knowski Dep. 78–79). Riordan also refused to allow Knowski to put his coat on for him (J. 12(M) ¶ 55).

Riordan also exhibited further signs of intoxication while in his room. At one point he fell on the floor, and Officers had to help him back up (Morris Dep. 26). He repeatedly cursed at the officers and had to be told repeatedly to sit down (Knowski Dep. 77–79). Riordan's behavior and appearance led both Officers to believe that he was intoxicated and that his blood/alcohol level exceeded .10, the legal limit for driving in Illinois (R. 12(M) ¶ 41). Officers therefore made several offers to take Riordan to a detoxification center, shelter or hospital or to the house of a friend or relative (J. 12(M) ¶¶ 70–72). Riordan belligerently rejected all those offers (Seme Dep. 99–100).

Finally Officers forced Riordan to leave his room, again guiding him by the elbows, and took him outside the Sports Center (J. 12(M) ¶¶ 66–68). At that point the ambient temperature outside was less than 20$ Fahrenheit (R. 12(M) ¶ 58). Riordan was wearing only his t-shirt, jeans and corduroy jacket (*id.* ¶ 83). He was not wearing socks, shoes, a hat, gloves or any other winter clothes (*id.*). Furthermore, Riordan's address book and wallet, which contained his money and state-issued identification card, were left behind with his possessions at the Sports Center (*id.*).

Officers handcuffed Riordan and placed him in the back of Knowski's police cruiser. They did not, however, arrest him. While Seme believed that Riordan could have been arrested for aggravated battery of a police officer and resisting arrest, Seme instead told Knowski that they should issue Riordan a compliance ticket for trespassing (J. 12(M) ¶ 83).[3] Seme felt that the compliance ticket would let Riordan know that he could not return to the Sports Center (*id.*).

Officers decided to take Riordan to the Joliet Police Department ("Department"), only a two minute drive away, because transients were allowed to stay in the lobby area of the police station overnight to stay warm (*id.* ¶ 78). Knowski took Riordan in his

---

**3.** Seme knew that Sports Center had entered into a "Joliet Police Department Agency Agreement" that allowed the Department to direct non-residents to leave the Sports Center, arrest persons on the property who refused to leave and sign criminal complaints against persons on behalf of the Sports Center (R. 12(M) ¶ 30). Joliet police officers are authorized to issue compliance tickets for minor violations of Joliet ordinances (recipients can either pay $75 or contest the ticket), but they do not take violators to the police station for booking (J. 12(M) ¶¶ 84–85).

squad car and, during the drive, again offered to take Riordan to a hospital or a family member's house. Riordan refused both offers and reiterated that he had no friends or family in the area (*id.* ¶¶ 87–89).

Knowski parked his squad car about three car lengths south of the intersection of Washington and Joliet Streets (*id.* ¶ 93). That intersection is approximately 100 feet east of the Department, which is located on the second floor of the south side of the Joliet Municipal Building. Department's lobby area is reached by entering through a set of locked doors (a buzzer system allows entrance) at the top of a flight of stairs that lead down to Washington Street (R. 12(M) ¶ 67). None of the other doors to the Municipal Building was open in the evening (*id.* ¶ 84).

Knowski wrote out a compliance ticket for Riordan and then released him from the back of the car and removed his handcuffs (*id.* ¶ 70). Knowski asked Riordan to sign the ticket, but Riordan refused and simply scribbled on the form until Knowski took it back (J. 12(M) ¶ 97). Knowski wrote on the narrative portion of the ticket that Riordan was "unable to sign this document because of his intoxication" (R. 12(M) ¶ 71).

Knowski twice told Riordan to go to the station and call someone for a place to stay, but Riordan refused each time (R.Exh. 30). At that point Seme drove up in his squad car and also urged Riordan to go to the police station. Riordan finally started walking slowly towards the station, but he continually stopped, yelled insults and made obscene gestures at both policemen (J. 12(M) ¶ 112). Riordan also started to remove his jacket, but he stopped when Officers told him to put it back on (*id.* ¶¶ 110–11).

At 8:55 p.m. Seme drove away so that he could escort employees of a local currency exchange to their cars (R. 12(M) ¶ 75). That was part of his routine community service, rather than a response to an emergency call (*id.*). Riordan was about 50 feet away from the stairs leading to the police station doors when Seme left the scene (J. 12(M) ¶ 113). Although Seme returned to the police station when he completed his shift at 10:00 p.m., he did not check to see whether Riordan had entered the station (R. 12(M) ¶¶ 86, 88–90).

Knowski waited while Riordan walked somewhat closer to the police entrance, then he too drove away. Knowski last saw Riordan on the sidewalk near the stairs leading up to the police entrance (J. 12(M) ¶ 120). At 9:28 p.m. Knowski advised Department by radio that the call concerning Riordan had been completed and that he had issued a compliance ticket, but Knowski did not warn anyone at the station to look out for Riordan (R. 12(M) ¶ 80). Like Seme, Knowski also failed to check whether Riordan had entered the police station when he returned to the station at the conclusion of his shift at 11:30 p .m. (*id.* ¶¶ 87–90).

Riordan never entered the Department's vestibule area (*id.* ¶ 85). Instead he was next seen at 6:00 a.m. December 28, when a Joliet Police radio dispatcher found Riordan lying unconscious on a sidewalk in a recessed alcove in front of locked doors on the west side of the Municipal Building (*id.* ¶ 95). At that time the ambient temperature in Joliet was 11$ Fahrenheit, and the wind chill index was 7$ below zero (*id.* ¶ 96). Riordan was still wearing only a t-shirt, jeans and his corduroy coat (*id.* ¶ 97).

When Riordan was discovered he was foaming at the mouth and suffering from hypothermia and frostbite (*id.* ¶¶ 97–99). He was immediately taken by ambulance to Silver Cross Hospital. Tests taken at 6:35 a.m. showed that his blood/alcohol level was .227 (*id.* ¶ 100). Despite medical treatment, Riordan suffered severe frostbite that caused the skin on both of his heels to fall off (*id.* ¶ 101). Frostbite damage also forced doctors to amputate all of Riordan's toes in March 1996 (*id.*).

*Section 1983 Claim Against Officers*

Riordan asserts that Officers violated his constitutional rights when they released him in a highly intoxicated state into far-below-freezing temperatures wearing clearly inadequate clothing. Riordan urges that Officers' actions deprived him of his liberty interest in his own physical safety, a right guaranteed by the Fourteenth Amendment (*Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir.1997)).

■ Officers respond that they are entitled to qualified immunity for their conduct when they removed Riordan from the Sports Center and released him.[4] Qualified immunity operates to protect government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights" (*Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1173 (7th Cir.1997), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To defeat Officers' claim of qualified immunity, Riordan must show both (1) that Officers' conduct amounted to a constitutional violation and (2) that the constitutional standards implicated were clearly established at the time that Officers acted (*Forman v. Richmond Police Dep't*, 104 F.3d 950, 957 (7th Cir.1997)).[5]

Riordan contends that Officers' failure to protect him from the elements violated the substantive due process guaranty of the Fourteenth Amendment, relying for that purpose on principles articulated in *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). *DeShaney, id.* at 198, 109 S.Ct. 998 recognized that although the Due Process Clause does not generally confer an affirmative obligation on state government to secure the life, liberty or property interests of private citizens, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Those circumstances arise only when an affirmative exercise of the state's power so restrains an individual's liberty that it renders the individual unable to provide for his or her basic needs (*id.* at 199–200, 109 S.Ct. 998).

■ Post–*DeShaney* our Court of Appeals has phrased those "limited circumstances" in terms of "certain 'special relationships' created or assumed by the state with respect to certain individuals" (*Estate of Stevens*, 105 F.3d at 1174). Such a "special relationship" arises in only two circumstances (*id.*):

> (1) custodial settings in which the state has limited the individual's ability to care for himself, and (2) when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced.[6]

Hence Riordan can prevail against Officers for their failure to protect him only if he can show that one of those two kinds of special relationships existed when Officers released him from custody.

■ Riordan argues that Officers owed him a duty of care because their actions affirmatively placed him in a position of danger that he otherwise would not have faced.[7]

4. Officers were indisputably acting under color of state law when they removed Riordan from the Sports Center.

5. It should be noted that Riordan does not literally have to "show" or "prove" or "establish" anything, for Rule 56 requires only that he demonstrate the existence of a genuine issue of material fact to defeat Officers' or Joliet's motion for summary judgment. And the same concept applies in favor of Officers and Joliet on Riordan's motion. Although this opinion uses the more demanding terms in a shorthand manner, both to avoid the cumbersome repetition of the summary judgment standard and to echo the language of controlling case law, this Court has properly imposed the lesser burden on each nonmovant.

6. [Footnote by this Court] Because *Estate of Stevens* postdates Officers' conduct at issue here, it is important for qualified immunity purposes to observe that not only *DeShaney* but also several cases discussed hereafter in the text as analogous to the present case had been decided some years *before* the events now in controversy. It is those cases that gave content to the clearly-established constitutional right here.

7. Riordan has not argued that Officers owed him a duty under the "in custody" special relationship identified in *Estate of Stevens*, apparently conceding that his few minutes of confinement in Knowski's police cruiser were too brief to interfere with his ability to care for himself. That restraint is wise, for *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998 cited *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (which held that the state was required to provide adequate medical care to incarcerated prisoners) and *Youngberg v. Romeo*, 457 U.S. 307, 314–15, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (which held that the state had to provide involuntary committed mental patients with the necessary services to ensure their reasonable safety from themselves and others) as examples of a "deprivation of liberty" that triggered substantive due process protections. Thus *DeShaney* was concerned with significantly more intensive

He points out that Officers removed him from the warmth and safety of the Sports Center and then released him from custody into the bitter cold, wearing clearly inadequate clothing, when he was obviously unable to fend for himself in a rational way.

There is no question that Riordan was in a potentially dangerous position when Officers left him. He was not wearing socks, shoes, a hat, gloves or winter clothing. Given the frigid temperature in Joliet that night, he was clearly at risk of exposure if he did not find shelter. Indeed, both Officers recognized that it was dangerously cold for someone dressed as inadequately as Riordan. And his actions, stemming from his highly elevated state of intoxication, plainly signaled a high degree of likelihood that he would not be able to protect himself against the danger.

Officers' actions are analogous to other cases in which courts have found policemen liable or potentially liable for substantive due process violations. For example, in *White v. Rochford*, 592 F.2d 381 (7th Cir.1979) several young children were riding in a car with their uncle when police stopped the car, arrested the uncle for drag racing and left the children in the car on the side of a busy highway at night in cold weather. *White, id.* at 384 held that the police had violated the children's substantive due process rights when the officers "left helpless minor children subject to inclement weather and great physical danger without any apparent justification."[8] Similarly, *Wood v. Ostrander*, 879 F.2d 583, 593 (9th Cir.1989) held that a police officer could be found liable when he stopped a car at 2:30 a.m. in a high-crime area, took the driver into custody for drunk driving, took the keys and left a female passenger alone in the car, while *Kneipp v. Tedder*, 95 F.3d 1199, 1208–11 (3d Cir.1996) similarly

held that police officers could be found liable for sending a visibly intoxicated woman's escort home and then abandoning her by the side of the road in cold weather.

To be sure, the fact that Officers' actions placed Riordan in a manifestly dangerous position does not of itself necessarily mean that they violated Riordan's substantive due process rights. *Estate of Stevens*, 105 F.3d at 1177 held that no affirmative duty to protect arises, even if police action created a danger for an individual, if the police provided the individual an avenue for self-help to avoid the danger. There police officers prevented an intoxicated man, Stevens, from going back into to a nightclub after he was involved in an altercation inside. Instead Stevens voluntarily accepted an offer from the police to take him to a nearby gas station so that he could telephone for a ride home, but Stevens was struck and killed by a car 90 minutes later as he walked home down a dark highway. *Estate of Stevens, id.* held that the officers owed Stevens no affirmative duty of protection, even though they had increased the danger to Stevens by separating him from his friends who might have driven him home, because the officers had offered Stevens a number of reasonable alternatives to get home safely and he chose one of them: to get a short ride to the gas station, where he could telephone for transportation for the longer ride home.

Officers argue that *Estate of Stevens* should control this case because they gave Riordan a variety of safe alternatives to being released on the street. Riordan refused offers to be taken to a hospital, a detoxification center or a shelter and indicated that he did not have any friends or family in the area. Furthermore, Officers point out that although Riordan was released on the street,

---

and extended custodial deprivations of liberty than are normally encountered during simple criminal arrests (*Estate of Stevens*, 105 F.3d at 1174–75). Furthermore, although Riordan was arguably underdressed during his brief confinement, he has not alleged that he suffered any harm while in custody. Instead his physical injuries stem from his exposure to the elements after he was released.

8. *White*, 592 F.2d at 385 held that government actors could be held liable for their "gross negli-

gence" or "reckless disregard" for the safety of others. *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (en banc) later clarified that government actors are liable only for criminally "reckless" conduct, not for gross negligence. Nonetheless *White* remains good law in this Circuit, as evidenced both by the approving reference to *White*'s holding in *Archie, id.* at 1223 and by the reliance placed upon *White* in *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir.1993) in determining whether a police officer's actions could be characterized as reckless.

they intentionally released him near the relative safety of the police station and explicitly told Riordan to go inside to the lobby area to keep warm.

But those offers of assistance could insulate Officers from liability only if Riordan had been capable of acting upon them. Implicit in the *Estate of Stevens* holding that offering an individual alternative means of self-help releases government actors from any affirmative duty of protection is the assumption that the individual is capable of self-help. Offering reasonable alternatives to an incapacitated person is no better than an empty gesture. *Estate of Stevens*, 105 F.3d at 1177 carefully noted that while Stevens was legally intoxicated (his blood alcohol level was .237 at the time of his death), neither Stevens' friends nor the police gave any indication that he was incapacitated when he left the nightclub.

In sharp contrast, Riordan has raised a genuine issue of material fact as to whether he was so drunk that he was incapable of acting on Officers, offers of assistance [9]—that if anything he was even more helpless than the minor children in *White*. It is undisputed that Riordan was legally intoxicated when the police removed him from the Sports Center. But that seriously understates the case, for both medical evidence and Riordan's conduct raise a factual issue as to whether Riordan was so inebriated that he could not take care of himself.

Riordan's blood/alcohol level was .227 when it was tested at 6:35 a.m. on December 28, shortly after he was discovered outside of the Municipal Building. Riordan has submitted expert testimony that extrapolates from that figure to determine that his blood/alcohol level was .427 at 8:30 p.m. on December 27, shortly before Officers first encountered Riordan, and was .407 at 9:30 p.m., roughly 30 minutes after Knowski last saw Riordan (R. 12(M) ¶¶ 42, 82).[10] Riordan's extraordinarily high blood/alcohol level, particularly viewed in conjunction with Riordan's behavior, raises a serious factual issue as to whether Riordan was incapable of taking care of himself.[11]

Of course Riordan must do more than prove that he was incapacitated, for Officers can be held liable only if they knew or should have known that Riordan was in such a state (*Reed*, 986 F.2d at 1127). Officers admit that they knew that Riordan was legally intoxicated shortly after they encountered him, but they deny either knowing that Riordan was incapacitated or that they should have known that he was. Both Officers have said that

---

9. That fact also distinguishes Riordan's situation from the plaintiff decedent in another case Officers rely on, *Sellers v. Baer*, 28 F.3d 895 (8th Cir.1994). *Sellers, id.* at 900–01 held that police officers did not violate Sellers' clearly established constitutional rights when they removed him from a fairground (where he was making a public nuisance of himself) and released him in a parking lot near a police station. Even though Sellers was intoxicated, without funds and away from his companions, the court in *Sellers* felt that Sellers was in not in danger because he was still capable of making a phone call from the police station to save himself.

10. Officers attempt to counter by suggesting that Riordan might have consumed more alcohol after Knowski last saw him (thus rendering Riordan's expert's starting assumption invalid). But the only fact that Officers proffer to support that speculation is that at least one of several bars located seven blocks from the Municipal Building was open on the evening of December 27, 1995 (R. 12(N) ¶ 10). Officers' argument hinges on assumptions that Riordan somehow obtained liquor from one of those bars, despite his lack of money or identification and his obvious intoxication, and then walked back to the Municipal Building before passing out. That extraordinary level of improbability does not qualify as a reasonable inference to be drawn against Riordan in resolving Officers' motion for summary judgment. Officers also suggest that Riordan might have passed out due to a alcohol-related seizure instead of as a consequence of being incapacitated from alcohol. There is some support for that possibility: Riordan did not normally black out after drinking one point of vodka, he had suffered such a seizure in early 1995 and he had stopped taking a prescription for anti-seizure medication (J. 12(M) ¶¶ 15, 20). But on analysis that proffered possibility is really irrelevant: Those facts were of course unknown to Officers, and the question at hand is whether they impermissibly placed Riordan in peril in light of the objective situation that was known to them—his irrational intoxicated behavior.

11. While the record is silent as to the physiological effects of such an elevated blood/alcohol level, it is a reasonable inference that such an extraordinarily high level of intoxication could incapacitate Riordan.

they believed Riordan was alert and that he did not need medical attention.[12]

On the other hand, Officers witnessed behavior by Riordan that a factfinder could reasonably determine had alerted them that Riordan was incapable of taking care of himself. Riordan's conduct that night demonstrated that he was oblivious to his own personal safety and well-being. Although he was plainly inadequately dressed to go outside in worse-than-freezing weather, he refused to put on more clothing. Riordan even went so far as to kick off his shoes when Knowski tried to put them on for him. His inattentiveness to his physical safety was further underscored when he attempted to take his corduroy jacket off *after* he had been released outside into the bitter cold.

Riordan's actions also reflected that he was not capable of understanding his predicament. Although both Morris and Officers told him that he could not return to the Sports Center, Riordan left the hotel without his money, identification card, address book or any other possession that would have enabled him to obtain shelter that night. He also belligerently refused to accept a number of reasonable offers by both policemen to take him to safety. Riordan's conduct gave no indication that he was aware that he needed shelter or that he was capable of formulating any kind of survival plan in the face of the danger confronting him.

In sum, Riordan has presented enough evidence to present a genuine issue of material fact as to whether Officers knew or should have known that he was incapable of taking advantage of their offers of assistance.[13] That conclusion means that Officers can be held liable for putting Riordan in a position of danger even though Riordan still had opportunities (at least in theory) for self-help.

That leaves Riordan with one final hurdle to setting out a constitutional violation: He must show that Officers' actions can be characterized as reckless. As *Weinberger v. State of Wisconsin*, 105 F.3d 1182, 1186 (7th Cir.1997), quoting *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992), has confirmed the definition of that concept:

> [B]y reckless or deliberately indifferent conduct, we mean conduct that is criminally reckless—that is, conduct that reflects a complete indifference to risk such that we can infer the actor's knowledge or intent.

Negligent or even grossly negligent behavior does not meet that standard (*Archie*, 847 F.2d at 1219–20).

While there is no question that criminal recklessness is a stringent standard, Officers' actions in this case rise to (or, more precisely, fall below) that level if they knew or should have known that Riordan was unable to help himself. Because it has already been found reasonably inferable that Officers were aware of Riordan's condition, they abandoned an incapacitated man in below freezing temperatures wearing obviously inadequate clothes. Under the precedents, that conduct reflects deliberate indifference to the risks facing Riordan.

It is no answer for Officers to argue that they believed Riordan was headed toward safety when they left. After all, Riordan never actually gave any indication that he planned to go inside the station. Instead Officers say they assumed, because Riordan was walking toward the stairs, that he intended to go inside. But that is scarcely a fair assumption: Riordan had just refused to go to the lobby the first two times that

---

12. Officers also argue that Riordan was coherent enough to answer questions and could walk by himself, but there is a material factual dispute on that score. While Riordan had to answer some basic personal questions so that Knowski could write out the compliance ticket, Riordan was unable to sign the ticket because of his intoxication. Similarly, while Riordan could walk at a slow pace towards the police station, Officers had to support him by the elbows while escorting him in the Sports Center.

13. What has been said on the other side of the coin, however, also compels the denial of Riordan's motion for summary judgment. For that purpose this Court must credit Officers' statements that they thought Riordan was coherent and alert and not in need of medical attention, and they cannot be held responsible for knowing exactly how high Riordan's blood/alcohol level was. Further, although the argument seems quite thin, it may be viewed as a reasonable inference from Riordan's demonstrated ability to walk and talk that Officers should not necessarily have recognized that Riordan was incapacitated.

Knowski had told him to go there. And although Riordan did walk slowly towards the station, his frequent stops to turn and hurl abuse at Officers certainly gave little reason to believe that he was inclined to follow Officers' suggestions. In the face of those contrary signals and in light of Riordan's demonstrated inability to care for himself, it may fairly be viewed as reckless on the part of Officers not to ensure that Riordan actually went inside.

Officers' failure of care is even more stark because they had several options readily available to them other than leaving Riordan on the street near the police station. At an absolute minimum, Officers could easily have ensured that Riordan entered the lobby of the police station. All they had to do was to release Riordan from custody inside the building instead of on the street.

Officers also had the option of calling the Joliet Fire Department to transport Riordan to a Joliet hospital facility. Fire Department paramedics responded to such requests from Joliet police officers on a "daily" basis (Brooks Dep. 66). Officers did not need Riordan to agree to such a request, because they could have taken Riordan into "temporary custody" and accompanied the Fire Department personnel to the hospital (id. 68). So taking Riordan to a hospital, even involuntarily, was within Officers' power.

Moreover, Officers' failure to check on Riordan after they left, either via radio or when they returned to the police station at the conclusion of their respective shifts, further exemplifies their lack of concern for the danger facing Riordan. Riordan has thus established that if Officers knew or should have known that Riordan was incapable of taking care of himself, their failure to protect him reflected the requisite recklessness. And that conclusion means that Riordan has shown enough evidence to allege a constitutional violation.

■ That leads to the final component required to defeat Officers' claim of qualified immunity: Riordan must show that his constitutional right to protection was "clearly established" on December 27, 1995 (*Forman*, 104 F.3d at 957). Demonstrating that his constitutional right was "clearly established" does not require that Riordan show that a prior case is "on all fours" with the facts and law of his situation. It is enough that there be closely analogous cases (*id.* at 958). As stated in *Estate of Stevens*, 105 F.3d at 1174, quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.

Hence Riordan must show that in 1995 a reasonable police officer should have known that he or she could not release an incapacitated person from custody (in this instance, temporary custody) into a manifestly dangerous situation.

■ In 1995 it was clearly established that police officers could violate an individual's substantive due process rights by creating or substantially contributing to the danger facing that person (*Reed*, 986 F.2d at 1126–27). That reflects the fundamental tenet that "if the government hurls a person into a snake pit it may not disclaim responsibility for his safety" (*Archie*, 847 F.2d at 1222).

As already indicated, that principle had been applied before 1995 to impose liability on police officers for actions closely analogous to Officers' conduct. Again *White*, 592 F.2d at 384 had held in 1979 that police officers violated substantive due process principles by leaving "helpless" children (a term that included a 16–year–old) in great physical danger from inclement weather and heavy traffic. And *Wood*, 879 F.2d at 593 had extended *White*'s reasoning to impose a duty to protect an adult female passenger left alone and on foot in a high crime area at 2:30 a.m. (see *Reed*, 986 F.2d at 1127, using *Wood* as precedent to find an officer's conduct reckless).

Riordan was plainly less capable of helping himself than either the children in *White* or the female passenger in *Wood*. Officers should have realized that leaving Riordan in an incapacitated state in a dangerous situation would deprive him of his liberty interest in his own personal safety. That being so, Officers are not insulated from liability for their actions by qualified immunity. Their

motion for summary judgment cannot be granted.

### Section 1983 Claim Against Joliet

■ Riordan claims that Joliet is liable to him under Section 1983 because Officers deprived him of his constitutional rights pursuant to Joliet's established policies and procedures. To carry out Section 1983's requirement of direct rather than vicarious responsibility, municipalities may be held liable for civil rights violations committed by their employees if a municipal policy or custom inflicts the constitutional deprivation (*Baskin v. City of Des Plaines*, 138 F.3d 701, 704 (7th Cir.1998)).

Riordan's entire argument in that regard relies upon two of Joliet's responses to Riordan's Third Request for Admissions under Rule 36. That Request for Admission asked Joliet to admit these two assertions (worded identically, but referring separately to Seme and Knowski) (R. Ex. 6 ¶¶ 1–2):

> The actions taken by [Officers] on December 27, 1995, concerning the incident involving Daniel Riordan, were consistent with the policies and procedures of the Joliet Police Department.

Joliet unequivocally admitted both of those statements.

Rule 36(b) provides that any matter so admitted is "conclusively established unless the court on motion permits withdrawal or amendment of the admission." As Joliet has not sought to withdraw or amend its admissions, Riordan has thus conclusively established that Officers were acting "consistent with the policies and procedures of the Joliet Police Department." Indeed, that is the only thing that Riordan has established in support of his claim, for he has submitted no other evidence of any specific Joliet policies or customs that governed Officers' behavior involving Riordan.

■ Riordan's showing requires a closer examination of the Section 1983 liability imposed on municipalities. As already indicated, there is no respondeat superior liability, for the law demands a more active role on the municipality's part (*Baskin*, 138 F.3d at 704). *Board of County Comm'rs v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) has recently reconfirmed that in these terms:

> As our § 1983 municipality jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

■ That contrast implies a significant difference between a municipality's general authorization to its agents to act for it and its issuance of directions to its agents to perform specific actions. Joliet's admission that Officers acted in a manner "consistent with" Joliet's policies and procedures is open to interpretation either way. More information as to Joliet's applicable policies on police conduct is necessary to impart a more specific meaning to Joliet's admission.

■ That being the case, summary judgment procedure does not provide an appropriate path for either side to prevail at this stage. Here the Janus-like dual perspective demanded by Rule 56 compels the denial of both motions.

Joliet quarrels with that notion. It argues that if Riordan were really incapacitated, it must be found that Officers actually violated Department rules that forbid its police officers from issuing compliance tickets if the violator "requires medical attention, or is otherwise unable to care for his or her own safety or well-being" (J. 12(N) ¶ 134). But that is not necessarily the sole Department directive that might have governed Officers' treatment of Riordan. While Officers may have violated Joliet's policy on issuing compliance tickets, Joliet's admission raises the possibility that Officers may nonetheless have been following other Joliet policies. As indicated by the preceding paragraph, Riordan has presented a genuine issue of material fact as to whether Joliet policies mandated

Officers' violation of Riordan's constitutional rights.

On the other hand, it is also reasonable to infer from the language of Joliet's admission (more accurately, from the ambiguous way in which Riordan had framed the request to admit) that Officers' actions on *defendants'* view of the facts were consistent with Department's policies and procedures. And that type of "admission" cannot be leveraged into a summary judgment in Riordan's favor.

### Conclusion

Both sides have raised genuine issues of material fact in opposition to each other's motions for summary judgment on Riordan's Section 1983 claims (with the minor exception of Riordan's unargued Section 1983 claims discussed in n. 2). Except for the last-mentioned claims, which are dismissed, neither side is entitled to a judgment as a matter of law. This action must go to trial, the procedures for which will be discussed at a status hearing to be held at 9 a.m. June 11, 1998.