# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3918

_____

James Gladden, Jr., Individually and as Special Administrator of the Estate of
Bradley Scott Gladden, deceased

*Plaintiff - Appellant*

v.

Kenneth Richbourg, Officer, individually and in his official capacity as North
Little Rock Police Officer; Eric Van Imhoff, Officer, individually and in his
official capacity as North Little Rock Police Officer; Danny Bradley, Chief, in his
official capacity as Chief of the North Little Rock Police Department

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 13, 2014
Filed: July 23, 2014

_____

Before WOLLMAN and SHEPHERD, Circuit Judges, and WEBBER, District
Judge.

WOLLMAN, Circuit Judge.

Bradley Scott Gladden died of hypothermia after two police officers, Kenneth Richbourg and Eric Van Imhoff, transported Gladden from a restaurant in North Little Rock, Arkansas, to an isolated off-ramp outside the city. Gladden had asked the officers for a ride to his sister's house in the next county, but the officers instead left Gladden at the county line, which marked the edge of their jurisdiction, and instructed Gladden to seek assistance at a nearby factory. James Gladden (hereinafter James), both individually and as the administrator of Bradley Gladden's estate, sued the officers in their individual and official capacities and Police Chief Danny Bradley in his official capacity for abridging Gladden's federal constitutional rights in violation of 42 U.S.C. § 1983, abridging Gladden's state constitutional rights in violation of the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq.*, and committing the tort of wrongful death under the Arkansas Wrongful Death Act, Ark. Code Ann. § 16-62-101 *et seq.* The district court[1] granted qualified immunity to the officers, granted official immunity to all three defendants, and dismissed the state-law claims. We affirm.

I.

A little after midnight on December 12, 2010, Officer Richbourg responded to a 911 call from the Waffle House, a restaurant near Protho Junction in North Little Rock. The dispatcher informed Richbourg that "a white male wearing a beige jacket and jeans [had been] inside the business for about two hours refusing to leave." When Richbourg arrived, he saw Gladden, who matched the dispatcher's description. Security camera footage from inside the Waffle House shows that Gladden was wearing jeans, a blue striped shirt, a beige coat with a plaid lining, and tennis shoes. Gladden smelled of alcohol and had cuts on his face. He looked like he had been beaten up.

---

[1]The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

Gladden complied with Richbourg's request to accompany him outside the restaurant. Richbourg conducted a pat-down search of Gladden and found a small, unopened bottle of whiskey in Gladden's pocket, which he placed on the ground. Richbourg inquired about the cuts on Gladden's face, and Gladden explained that he had been attacked by two men at a gas station earlier that evening. Gladden declined Richbourg's offer to call an ambulance. Richbourg then checked to see if there were any outstanding warrants for Gladden and learned that there were none.

Around this time, Officer Imhoff arrived to assist Richbourg. Imhoff was familiar with Gladden, having on at least two previous occasions called emergency medical services on Gladden's behalf after determining that Gladden was excessively intoxicated. On another occasion, Imhoff had given Gladden a ride to the Lonoke County line on Interstate 40 and left Gladden at a place Gladden said was a half mile away from a family member's house. According to Imhoff, Gladden had asked to be let out a half mile away from the house because he did not want a police cruiser to approach the residence.

Gladden was also the subject of a departmental memorandum written by Sergeant Rick Bibb of the North Little Rock Police Department. Bibb's memorandum requested that any officer who arrested Gladden for public intoxication file a detailed report for use in civilly committing Gladden for rehabilitative purposes. Both Imhoff and Richbourg had received this memorandum.

On this particular night, it appeared to the officers that Gladden was only mildly intoxicated. According to both officers, Gladden was not slurring his speech and appeared coherent. Four Waffle House employees testified that Gladden appeared intoxicated but not excessively so. Imhoff, who, as recounted above, had seen Gladden in a severely intoxicated state, testified that "[i]f I had to guess just from the times I've normally dealt with him, he'd probably only had maybe a little bit of alcohol and I'm not sure as to how recent." Gladden told the officers that he was not

-3-

drunk and asked them not to take him to jail. The officers asked Gladden why he was at the Waffle House, to which Gladden replied that he was looking for a ride to his sister's house in Lonoke. Gladden then asked the officers if they could take him there. Richbourg responded that neither he nor Imhoff could take him all the way to Lonoke because it was "outside [their] area," but Richbourg offered to take Gladden to the Lonoke County line. Gladden agreed.

Gladden asked Imhoff if he could use Imhoff's phone to call his sister so that she could pick him up at the county line. Imhoff told Gladden that he would have to use the phone inside the Waffle House. Unaware of this exchange, Richbourg told Gladden to pick up his whiskey bottle and get in the back of his squad car if he wanted a ride. Gladden then retrieved the bottle and entered the back seat of Richbourg's squad car without having called his sister. Richbourg and Gladden departed the Waffle House and set off towards the county line on Interstate 40 at approximately 12:27 a.m.

Richbourg initially intended to drop Gladden off at the Kerr Road exit near the Lonoke County line. But the Kerr Road exit was isolated and dark, and Richbourg felt it would be unsafe to leave Gladden there. Richbourg instead proceeded to the next exit, the Remington Road exit, and let Gladden out there.

The temperature outside was between 25 and 35 degrees Fahrenheit when Gladden exited Richbourg's squad car at the Remington Road exit. The lights of the nearby Remington Arms factory shone a few hundred feet away. Aside from the factory the area was completely undeveloped.

Gladden asked Richbourg to direct him to the nearest gas station. Richbourg was unsure where the nearest gas station was, but he told Gladden to seek assistance at a guard station at the factory. The station itself was not visible from the Remington Road exit; it lay on the opposite end of a fenced-in parking lot, about a thousand feet

-4-

from where Gladden stood as the crow flies, and about a half mile by foot. A guard on duty that night testified by affidavit that the guard station was operational and that the guards would have assisted Gladden had he approached the station. After Gladden started walking in the direction of the guard station, Richbourg departed the intersection and returned to North Little Rock.

Gladden was found dead at approximately 10:37 a.m. the next morning. The cause of death was environmental hypothermia, with intoxication as a contributing factor (his blood alcohol content was .34). Gladden's body was found in the grass at a closed weigh station along Interstate 40, about a half mile from where Richbourg had left him, in the opposite direction of the factory.

James Gladden's action alleged that Officers Richbourg and Imhoff violated 42 U.S.C. § 1983 by abridging Bradley Gladden's clearly established constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Further, the suit asserted that the North Little Rock Police Department's custom of transporting intoxicated persons violated 42 U.S.C. § 1983 for the same reasons. It also alleged that the acts of the officers and the customs of the police department violated the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq.*, and that the officers had committed the tort of wrongful death under Ark. Code Ann. § 16-62-101 *et seq.* The district court granted summary judgment to the defendants after determining that the officers were entitled to qualified immunity and that all three defendants were entitled to official immunity. The district court then granted summary judgment to the defendants on James's state law claims after concluding that the resolution of his federal claims necessarily disposed of his state law claims. See Island v. Buena Vista Resort, 103 S.W.3d 671, 675-76 (Ark. 2003); Davis v. Fulton County, Ark., 884 F. Supp. 1245, 1262 (E.D. Ark. 1995).

II.

"We review a district court's qualified immunity determination on summary judgment *de novo*, viewing the record in the light most favorable to [the plaintiff] and drawing all reasonable inferences in [his] favor." Shannon v. Koehler, 616 F.3d 855, 861-62 (8th Cir. 2010) (alterations in original) (quoting Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010)); see also Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The defense of qualified immunity shields government officials from most tort suits. More specifically, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). There is no dispute here that the officers were performing a discretionary function when they transported Gladden to the county line. Thus, Gladden can prevail against the officers only if they violated his clearly established constitutional rights. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). We thus evaluate the officers' defense of qualified immunity from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation. Louden v. City of Minneapolis, Minn., 233 F.3d 1109, 1110 (8th Cir. 2000). If, based on those facts, the officer reasonably failed to comprehend that he was violating a person's clearly established constitutional rights, he is entitled to qualified immunity from suit. Id.

The constitutional right at issue here is Gladden's right to due process of law under the Fourteenth Amendment, sometimes described as a person's right to be free

from "abusive, arbitrary, or oppressive government conduct."[2] <u>Gregory v. City of Rogers, Ark.</u>, 974 F.2d 1006, 1009 (8th Cir. 1992) (en banc). James alleges that the officers violated this right by dropping Gladden off at an isolated off-ramp on a cold December night knowing that he was intoxicated and ill-prepared to fend for himself.

The Fourteenth Amendment generally does not give private citizens a constitutional right to police assistance. <u>DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.</u>, 489 U.S. 189, 196 (1989). Thus, if the officers had simply driven by the Remington Road exit and seen Gladden out in the cold, they would have been under no duty to rescue him. But we have recognized that an individual may be constitutionally entitled to police assistance under the Fourteenth Amendment in two circumstances: "first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." <u>Gregory</u>, 974 F.2d at 1010.

The officers in this case did more than pass Gladden on the side of the road; they transported him to a remote location on a cold night and left him to fend for himself. James asserts that this act gave rise to both of the "special relationships" described above and entitled Gladden to police assistance under the Fourteenth Amendment. <u>DeShaney</u>, 489 U.S. at 197. James cannot establish that either one of these special relationships existed, however, because the undisputed facts demonstrate that Gladden voluntarily accepted the ride to the Remington Road exit and was sober enough to make this decision rationally.

---

[2]James also argued to the district court that the officers violated Gladden's Fourth, Fifth, and Eighth Amendment rights, but he does not seriously challenge the dismissal of those claims on appeal.

## A.

Police officers have a constitutional duty to ensure the safety and well-being of those in their custody. Id. at 200-01. "Custody" in this context must be something more than an individual's reasonable belief that he is not free to leave, as is the case under the Fourth Amendment. See Estate of Stevens v. City of Green Bay, 105 F.3d 1169, 1175 (7th Cir. 1997). Rather, custody is effected for purposes of the Fourteenth Amendment only when the state "so restrains an individual's liberty that it renders him unable to care for himself." DeShaney, 489 U.S. at 200.

Gladden's brief ride in the back of Richbourg's squad car does not satisfy this high standard. See Stevens, 105 F.3d at 1175. Indeed, it does not even satisfy the lower standard of custody applied in Fourth Amendment cases, because Gladden himself asked for the ride to his sister's house and freely accepted the ride to the county line. James asserts that because the rear doors of Richbourg's squad car could not be opened from the inside, Gladden was not free to leave Richbourg's presence. But the mechanics of the squad car's door are less important than Richbourg's willingness to let Gladden out wherever he desired. Presumably, Gladden could have asked Richbourg to drop him off at a specific location, as he had done with Imhoff in the past, or to take him back to North Little Rock if he changed his mind about going to the county line. The officers were attempting to do Gladden a favor; at no point during the trip would a reasonable individual have believed that he was not free to leave the officers' presence.

Moreover, even if Gladden had been in Richbourg's custody during the trip to the county line, the harm he suffered did not occur until after he was let out of custody. Any custodial relationship between Gladden and the officers ended when Gladden exited Richbourg's vehicle. See DeShaney, 489 U.S. at 201. Accordingly, Gladden cannot avail himself of the constitutional right to police assistance based on a custodial relationship with the state.

B.

Police officers also owe a duty of care to individuals whom they place in positions of danger. To establish a constitutional violation under a state-created danger theory, a plaintiff must prove (1) that he was a member of a limited, precisely definable group (not in dispute here); (2) that the defendants' conduct put the plaintiff at a significant risk of serious, immediate, and proximate harm; (3) that the risk was obvious or known to the defendants; (4) that the defendants acted recklessly in conscious disregard of the risk; and (5) that, in total, the defendants' conduct shocks the conscience. Avalos v. City of Glenwood, 382 F.3d 792, 799 (8th Cir. 2004). We assess the risk of harm based on the information available to the officers at the time they allegedly created the risk, both because the risk must be "obvious or known" to the officers and because we determine qualified immunity from the perspective of a reasonable police officer. Louden, 233 F.3d at 1110. To "shock[] the conscience," the officers' acts must at least demonstrate "deliberate[] indifferen[ce]" to Gladden's constitutional rights. Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 779 (8th Cir. 2001). Taking the evidence in the light most favorable to James's position, we conclude that he cannot satisfy the third, fourth, or fifth elements of this test—those relating to the defendants' state of mind.

We note at the outset that, had Gladden been sober, the officers' act of leaving Gladden at the Remington Road exit would not have put Gladden at a "significant risk of immediate, serious, and proximate harm" at all. There was a guard station just over a thousand feet away from where Richbourg left Gladden, and the factory guarded by the shack was visible from the Remington Road exit a few hundred feet away. The defendants' expert noted in his report that Gladden could have walked six miles in the clothes he was wearing; had Gladden followed Richbourg's instructions and approached the guard station, he would have found shelter, warmth, and a phone.

Moreover, Richbourg dropped Gladden at the Remington Road exit only because Gladden himself agreed to be transported there. When a mentally competent individual voluntarily assumes a risk with state assistance, the resulting danger cannot be said to be state-created. See Stevens, 105 F.3d at 1177-78. Richbourg and Imhoff did not coerce Gladden into a dangerous situation; they simply offered him a ride to the Lonoke County line, which Gladden accepted. Gladden was under no obligation to accept the ride. He could have remained at Protho Junction. He could have asked the officers for a ride to another location within their jurisdiction. He could have accepted Richbourg's offer of medical assistance and gone to the hospital. Upon reaching the Remington Road exit, Gladden could have asked Richbourg for a ride to the guard shack or could have accompanied Richbourg back to North Little Rock if he believed the area to be unsafe. If Gladden was sober enough to make an informed, voluntary decision between these options, then the acts of the officers cannot be said to have created a risk.

The extent of Gladdens' intoxication, however, is a potentially complicating factor that must be taken into account. Circumstances that are harmless to a sober person may be dangerous to one who is severely intoxicated or otherwise incompetent. Bitterly cold weather is one such circumstance: while most people can be expected to navigate cold weather to find an indoor shelter, an intoxicated person may lack this capacity. In Riordan v. City of Joliet, 3 F. Supp. 2d 889, 891-93 (N.D. Ill. 1998), for example, police officers evicted a severely intoxicated man from his hotel and left him on the steps of the police station on a cold night with instructions to go inside the station. The man never entered the station, and he was found several hours later in the alcove of a nearby building, suffering from severe hypothermia and frostbite. Id. at 893. The court denied qualified immunity to the officers after concluding that the plaintiff's severe intoxication should have alerted the officers to his inability to care for himself on a cold night. Id. at 898-99.

A person's intoxication may also prevent him from making an informed, rational choice. Thus, even when an officer provides an individual with several alternatives and the individual elects to pursue the most dangerous option, the officers are not excused from creating a dangerous situation if it was obvious to the officers that the person was in no condition to make such a choice. See id. at 896.

Thus, Gladden's level of intoxication is the dispositive issue in this case. If Gladden appeared to the officers to be sober enough to walk to the guard shack and make a rational, informed decision, then the officers are entitled to qualified immunity. But they are not so entitled if Gladden was so intoxicated that Richbourg and Imhoff, in leaving Gladden at the Remington Road exit, acted recklessly in conscious disregard of an obvious risk of harm to Gladden such that their actions evince deliberate indifference to Gladden's constitutional rights.

It is not enough under this analysis that Gladden be mildly or even moderately intoxicated; he must have been so intoxicated that it would have been obvious to the officers that he was incapable of walking to the guard shack at the factory or of making decisions for himself. The facts of Riordan are instructive. In that case, the officers were presented with numerous signs that the plaintiff was severely intoxicated. Id. at 892-83. The plaintiff could not walk under his own power; the officers had to escort him out of his hotel by his elbows. The plaintiff could not dress himself and repeatedly kicked his own shoes off as the officers attempted to put them on his feet. Indeed, the plaintiff was too intoxicated even to sign a compliance ticket that the officers issued to him or to communicate with the officers meaningfully.

Gladden's intoxication did not rise to anywhere near this level. Four Waffle House employees testified as to Gladden's state on the night of December 11. Eboni Snowden stated that Gladden was "drunk" but not "as heavily drunk" as he usually was, and she interacted with Gladden coherently throughout the night. She stated that Gladden was dancing and talking to customers but was not being disruptive in any

-11-

way. She also stated that by the time the officers arrived, Gladden was less intoxicated than he had been when he first arrived at the Waffle House; he "wasn't as wobbly and his words weren't slurring as much." She stated that Gladden was "walking on his own, talking, dancing[,] . . . cracking jokes. Praising God. Rubbing my face. Everything. Getting lotto tickets. He was doing normal things. Walking across the street." Troy Johnson testified that Gladden was asking people for cigarettes and trying to find a ride home. He stated that Gladden had a "six pack . . . buzz" but that he was not so drunk that he was a danger to himself. Orlando Poe, who was off that night but was at the Waffle House to pick up his brother, testified that Gladden spoke with him coherently from 9:00 to 9:45 p.m., telling Poe that he looked like someone on television, asking Poe for a ride home, and joking that Poe was the rapper Fifty Cent. And Shirley Blakely testified that Gladden was moving from chair to chair, entertaining the customers. All four employees testified that they did not observe Gladden consume any alcohol from the time he had entered the Waffle House until the time he left with Richbourg.

The officers themselves testified that Gladden seemed functional at all times during their encounter. When Richbourg arrived shortly after midnight, Gladden was standing by a booth talking to several customers. Gladden was walking normally and answered the officers' questions directly and coherently. Although he appeared to have been drinking, he was not slurring his words or wobbling.

The security camera footage from that night lends support to these perceptions. From approximately 9:00 p.m. until the time Richbourg led Gladden out of the Waffle House at 12:05 a.m., the footage shows Gladden conversing with various customers, walking around, drinking coffee, and generally behaving like a normal person. He appears to have full motor control at all times. At several points during the night, Gladden navigates around a yellow two-and-a-half foot tall "wet floor" sign without knocking it over. Simply put, Gladden does not exhibit the characteristics of someone who is unable to walk less than a mile to a guard shack or is unable to make basic decisions rationally.

Sergeant Bibb's memorandum does not change our conclusion. The memorandum instructed police officers to file a detailed report the next time an officer arrested Gladden for public intoxication; it did not state that officers were to hospitalize or arrest Gladden the next time they encountered him. The memorandum may have indicated to Richbourg and Imhoff that Gladden was an alcoholic, but it did not indicate that Gladden was mentally incompetent.

In short, Gladden's mild signs of intoxication were not enough to alert the officers to the possibility that Gladden might not be able to make decisions for himself and might not be able to find his way to a guard shack a short distance away from where Richbourg dropped him off. While it may have been negligent for the officers to leave a mildly intoxicated man at a rural intersection on a cold night, their conduct in doing so was not so reckless that it shocks the conscience of the court.

Because of our conclusion that Richbourg and Imhoff did not violate Gladden's constitutional rights, we need not reach the question whether these rights were clearly established at the time of their alleged violation.

III.

We turn next to Gladden's claims against Richbourg, Imhoff, and Police Chief Bradley in their official capacities, reviewing *de novo* the district court's grant of summary judgment to the defendants based on official immunity. Grayson v. Ross, 454 F.3d 802, 810 (8th Cir. 2006). "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Id. at 810-11 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). Gladden asserts that the North Little Rock Police Department has a custom of transporting intoxicated individuals to remote locations and that this custom violates the Fourteenth Amendment's due process guarantee.

As outlined above, the Fourteenth Amendment imposes an affirmative duty of care on a police officer in only two circumstances: when the officer places an individual in custody, and when the officer affirmatively places an individual in a position of danger. Assuming that the North Little Rock Police Department has a custom of giving rides to persons in its jurisdiction, Gladden cannot establish that this custom implicates either of the above-described relationships.

A police officer does not place a person in custody by acquiescing to the person's request to be transported somewhere. Nor, in most cases, does such an act affirmatively place the passenger in a position of danger, since the individual retains the option of declining the ride or changing his mind once he reaches his destination. The analysis might change if a person requests a ride to a patently dangerous location or if it is obvious to the officer that the person requesting the ride is in no position to make decisions for himself. But Gladden has not alleged even one instance of a police officer transporting an individual to a patently dangerous location or transporting a mentally incapacitated individual to any location. Accordingly, Gladden's official capacity claims must fail.

IV.

Lastly, we address Gladden's claims under the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq.*, and the Arkansas Wrongful Death Act, Ark. Code Ann. § 16-62-101 *et seq.* As Gladden acknowledges, both of these claims rise and fall with the resolution of his federal claims. See Island v. Buena Vista Resort, 103 S.W.3d 671, 675-76 (Ark. 2003); Davis v. Fulton County, Ark., 884 F. Supp. 1245, 1262 (E.D. Ark. 1995). Because we have concluded that Gladden's federal claims against the officers and police chief fail, Gladden's state law claims must fail as well.

V.

The judgment is affirmed.

_____

-14-