# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-2680

_____

Kathleen Meehan

*Plaintiff - Appellee*

v.

Officer Scott Thompson, in his individual and official capacities as a police officer for the City of Edina

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 14, 2014
Filed: August 14, 2014

_____

Before WOLLMAN, MELLOY, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Kathleen Meehan sued Officer Scott Thompson for abridging her Fourth Amendment rights in violation of 42 U.S.C. § 1983 and for battery and false imprisonment under Minnesota state law. Thompson asserted the defenses of qualified and official immunity and moved for summary judgment. The district court denied Thompson's motion, and we reverse and remand.

I.

We recount the facts of this case in the light most favorable to Meehan, the non-moving party. Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam). Where possible, we rely on evidence from a videotape of the incident recorded by a dashboard camera mounted in a police cruiser at the scene. See Scott v. Harris, 550 U.S. 372, 380-81 (2007).[1]

On the night of April 28, 2011, Meehan and her husband hosted a small dinner gathering at their home in Edina, Minnesota. The gathering was attended by a neighbor, a family friend named Kitty Anderson, and Kitty's daughter Katie Anderson. Katie left the gathering in her car after consuming several alcoholic drinks. She crashed into another vehicle about ten blocks away and called her mother for assistance. Kitty and Meehan, both of whom had also been drinking alcohol, left the gathering, and Kitty drove her car to the scene of the accident, with Meehan in the passenger's seat. When they arrived, they discovered police officers already conducting field sobriety tests on Katie. Kitty parked her car, and the two women exited the vehicle and approached the officers. The officers ordered the women to get back into the car, and they complied. Katie was ultimately arrested for driving while intoxicated, her blood alcohol content testing out at .11.

An officer then approached Kitty's car and asked Kitty if she had been drinking. Kitty responded that she had been. The officer instructed Kitty to step out of the car to perform field sobriety tests. Kitty failed the tests, and, after a preliminary

---

[1]The video is synced with audio captured by a microphone worn by another officer at the scene, so only portions of the interactions between Meehan and Thompson are audible on the recording. Where possible, we rely on the audio recording; otherwise, we adopt Meehan's versions of the statements that she and Thompson made at the scene.

breath test revealed that her blood alcohol content was .18, she was also arrested for driving while intoxicated.

That left Meehan, who had remained in the passenger's seat of Kitty's car while Kitty performed the field sobriety tests. Meehan had forgotten her own cell phone at home, so she used Kitty's phone to call her husband and relay to him the events unfolding at the scene.

Officer Thompson arrived sometime during the course of the two DWI arrests. The other officers at the scene asked Thompson to tend to Meehan and informed him that Meehan "seem[ed] to be a little worse than [Kitty Anderson]." Thompson approached the front passenger's side door of Kitty's car and observed Meehan speaking on a cell phone. Thompson asked Meehan if she had been drinking, and Meehan replied that she had been. Another officer approached the driver's side door and informed Meehan that Kitty wanted her phone back, to which Meehan replied that she was using it. Meehan then asked her husband over the phone to meet her at Lund's, a nearby grocery store, and asked Thompson, "I can go to Lund's, right?" to which Thompson replied, "No, you're not going to Lund's." Meehan asked him why she could not go to Lund's, and Thompson replied, "I'm not going to tell you this again. I'm not going to repeat myself. You need a sober adult to come take care of you or I'm taking you to detox. That's the end of it." Meehan relayed Thompson's statement to her husband and informed him of her location. Meehan then asked Thompson if she could call a taxi, and Thompson denied the request.

Thompson then instructed Meehan to exit Kitty's vehicle, as it was about to be towed. Meehan complied and followed Thompson back to his squad car. Once there, Thompson told Meehan that she would have to perform a field sobriety test. According to Meehan, Thompson did not ask her to perform a preliminary breath test. Meehan asked Thompson why it was necessary for her to perform a field sobriety test, as she had not been driving. Thompson replied by ordering Meehan to get up against

his squad car, and when Meehan again asked why, Thompson replied, "Get up against the car or I'll put you against the car." Meehan complied, and Thompson frisked her. Meehan later testified, "I recall vividly his big black boot coming in between my legs and shoving them apart before he frisked me. . . . It was violating and violent. It was horrid." Meehan does not allege that she suffered any lasting physical injuries from the frisk.

Thompson then placed Meehan in the back of his squad car. Thompson himself got into the driver's seat and told Meehan that he was giving her an opportunity to find a ride home. Meehan again called her husband to coordinate a ride home. Meehan's husband could not come himself, as he had also been drinking, but he offered to call Meehan's sister and ask her to retrieve Meehan. While Meehan was on the phone with her husband, Thompson looked up her address and learned that she lived about a mile away. Another officer then asked Meehan again to return Kitty's phone, whereupon Meehan gave her sister's number to her husband, ended the call, and gave the phone to the officer.

Thompson and Meehan waited in Thompson's squad car for approximately three and a half minutes. According to Meehan, Thompson then told her, "I've lost my patience with you. I'm taking you to detox." When Meehan reminded Thompson of his statement that he would give her an opportunity to find a safe and sober ride home, Thompson replied, "I don't see one, do you?" Thompson then transported Meehan to a detox facility ten miles away in Minneapolis. Approximately three minutes after Thompson left the scene, Meehan's husband arrived with a neighbor to pick up Meehan.

Thompson and Meehan arrived at the detox facility at about 11:40 p.m. On the intake form, Thompson wrote that he had taken Meehan into custody because she had "refused [a preliminary breath test] or to cooperate with her care." He also indicated, by checking boxes on the form, that Meehan was "obviously under the influence" of

-4-

alcohol and that she exhibited symptoms of bloodshot and glassy eyes, slurred speech, anger, agitation, uncooperativeness, and talkativeness. A blood test revealed that Meehan's blood alcohol content was .082. The intake staff noted that Meehan had normal speech, a steady gait, and a cooperative demeanor. Meehan was discharged from the detox facility the following afternoon.

## II.

"We review a district court's qualified immunity determination on summary judgment *de novo*, viewing the record in the light most favorable to [Meehan] and drawing all reasonable inferences in [her] favor." Shannon v. Koehler, 616 F.3d 855, 861-62 (8th Cir. 2010) (quoting Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010)); see also Tolan, 134 S. Ct. at 1863. Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Qualified immunity shields government officials from civil liability insofar as their conduct in performing discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides "ample room for mistaken judgments," Malley v. Briggs, 475 U.S. 335, 343 (1986), and protects "all but the plainly incompetent or those who knowingly violate the law," id. at 341. "To overcome the defense of qualified immunity the plaintiff must show: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555

U.S. 223, 236 (2009). As we explain below, we resolve this case on the basis of the second prong—the clarity of the law at the time of Meehan's arrest. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). We thus evaluate Thompson's conduct "from the perspective of a reasonable officer on the scene possessing the same information." Louden v. City of Minneapolis, 233 F.3d 1109, 1110 (8th Cir. 2000).

The right at issue in this case is Meehan's Fourth Amendment right to be free from unreasonable searches and seizures by police officers. U.S. Const. amend. IV. Meehan asserts that Thompson is not entitled to qualified immunity because he violated her clearly established Fourth Amendment rights in two ways: first by arresting her without a reasonable belief that she was intoxicated and presented a danger to herself or others, and second by frisking her without a reasonable suspicion that she was armed or dangerous. We conclude that neither act by Thompson abridged Meehan's clearly established Fourth Amendment rights.

A.

We begin with Meehan's assertion that Thompson's decision to transport her to a detox facility constituted an unreasonable seizure under the Fourth Amendment. The parties do not dispute (1) that this act constituted an arrest, and (2) that Thompson did not suspect Meehan of committing any crime. We conclude that, at the time of Meehan's arrest, the law was not clearly established that a police officer could not constitutionally arrest an individual whom he reasonably believed to be moderately intoxicated and who would otherwise be left alone on a public roadway at night.

-6-

Thompson asserts that his arrest of Meehan was a valid exercise of his role as a "community caretaker." See Cady v. Dombrowski, 413 U.S. 433, 441 (1973) (recognizing the community caretaker function of police officers). We have recognized that it may be reasonable under the Fourth Amendment for a police officer, acting in his capacity as community caretaker, to seize an apparently intoxicated individual "to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." Winters v. Adams, 254 F.3d 758, 763 (8th Cir. 2001) (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993)). Such an arrest is reasonable "if the 'governmental interest in the police officer's exercise of [his] community caretaking function,' . . . outweighs 'the individual's interest in being free from arbitrary government interference.'" United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014) (quoting Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006)). As we made clear in Winters, the primary governmental interest underlying the arrest of an intoxicated individual who is not suspected of criminal activity is a concern for safety. 254 F.3d at 763. Meehan asserts that this interest does not justify her arrest because, under clearly established law, her apparent intoxication was too mild to support a reasonable inference that she was a danger to herself or others. We disagree. As we explain below, Thompson reasonably believed that Meehan was at least moderately intoxicated, and the law at the time of Meehan's arrest was not so clear that a reasonable officer would have known that he lacked probable cause to arrest a moderately intoxicated individual in lieu of leaving her alone on a public roadway at night.

1.

Before we determine whether clearly established law made it unreasonable for Thompson to believe that the danger Meehan faced warranted arresting her "to ensure the safety of the public and/or the individual," Winters, 254 F.3d at 763, we must determine the extent to which a reasonable officer would have believed that Meehan

was in danger in the first place.  We thus begin our analysis by examining the indicia of danger that were apparent to Thompson at the time he arrested Meehan.

These indicia were numerous.  Meehan was stranded on a public road without a car; she was alone at night; and, most saliently, she appeared to be at least moderately intoxicated.  Meehan's apparent intoxication is relevant not only because intoxication can be dangerous in itself but because a person's intoxication may exacerbate the other potential hazards of her environment, such as the late hour and her location on a public roadway, and may impair her ability to recognize these hazards.  See Gladden v. Richbourg, No. 12-3918, 2014 WL 3608521, at *6 (8th Cir. July 23, 2014) ("Circumstances that are harmless to a sober person may be dangerous to one who is severely intoxicated[.]").

The inference that Meehan presented a danger to herself or to others thus depends in large part on Meehan's apparent level of intoxication.  The parties sharply dispute the extent to which Meehan would have appeared intoxicated to a reasonable police officer in Thompson's shoes.  Viewing the evidence in the light most favorable to Meehan, and affording Thompson "substantial latitude in interpreting and drawing inferences from factual circumstances," United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997), we conclude that a reasonable officer could have inferred that Meehan was at least moderately intoxicated.

Even before he encountered Meehan herself, Thompson had reason to believe that she was intoxicated.  Thompson arrived at the scene of the accident as Katie and Kitty Anderson were being arrested for DWI's, and his fellow officers informed him that Meehan "seem[ed] to be a little worse than [Kitty Anderson]."  Thompson testified that he inferred as much from Meehan's decision to ride in a car driven by someone whose blood alcohol content was more than twice the legal limit, a fact that suggests both that Meehan's judgment was impaired and that she was in no better condition to drive than the intoxicated driver.

-8-

Thompson's interactions with Meehan, as captured by the dashboard camera of a police cruiser behind Kitty's car, support Thompson's belief that Meehan was intoxicated. Meehan admitted to Thompson that she had been drinking, and although she could walk without difficulty, she did have some trouble communicating with the officers and with her husband. Thompson testified that Meehan was slurring her words, and the audio recording of their interactions supports this observation to a degree. It took Meehan several tries, for instance, to articulate her location to her husband, and the officers had to ask Meehan several times to return Kitty's phone before she complied. Meehan also remained generally agitated throughout the encounter, and while such agitation does not necessarily suggest that she was intoxicated, it is at least consistent with intoxication and was a factor that Thompson could reasonably have considered in forming an inference that Meehan was intoxicated.

Meehan has not set forth sufficient evidence in response to create an issue of fact as to whether Thompson reasonably believed she was at least moderately intoxicated. She relies primarily on her own testimony, the video footage of her interactions with Thompson (which we believe supports an inference of moderate intoxication), and the intake staff's report. The intake report is only marginally helpful to Meehan because it was conducted in a controlled setting more than thirty minutes after her interactions with Thompson at the scene, by which time Meehan's disposition might have changed. At any rate, the intake staff noted that Meehan's blood alcohol content was above the legal driving limit, which is consistent with Thompson's observations. The video footage, moreover, appears to contradict some of Meehan's testimony. Meehan testified, for instance, that Thompson immediately asked her to step out of the car and that she promptly complied. The video, however, shows Thompson speaking with Meehan in her car for several minutes before she exits, which supports Thompson's testimony that he asked Meehan several times to find a sober ride home but that she ignored him.

-9-

Accordingly we conclude that Thompson has established beyond genuine factual dispute that he reasonably believed that Meehan was at least moderately intoxicated.[2] This belief in itself supports an inference that Meehan presented at least some danger to herself, and, as noted above, it also amplifies other indicia of danger, such as the fact that Meehan was alone on the side of a public roadway at night.

2.

We turn next to whether these indicia of danger gave Thompson probable cause to arrest Meehan in his capacity as community caretaker. We conclude that the law at the time of Meehan's arrest did not provide a clear answer to this question and that Thompson is thus entitled to qualified immunity.

The Fifth Circuit upheld the search of a severely intoxicated individual in similar circumstances. In United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc), police officers were on patrol at night when they encountered an individual standing in the road. After the officers flashed their bright lights, the individual stumbled out of the road, and police eventually searched the individual and discovered a firearm. The Fifth Circuit upheld the search as a valid exercise of the officers' community caretaker function, noting that "[p]olice have long served the public welfare by removing intoxicated people from the public streets, where they pose a hazard to themselves and others." Id.

---

[2]Lambert v. City of Dumas, 187 F.3d 931 (8th Cir. 1999), is not to the contrary. In Lambert, we were faced with two conflicting accounts of the events leading to the arrest of an allegedly intoxicated man. Id. at 935. With nothing to support one version or the other, we adopted the version of the party opposing summary judgment and held that, under that party's version of the facts, the arresting officers had no reason to believe the man was intoxicated. Id. In this case, by contrast, Thompson has set forth uncontroverted evidence supporting an inference of intoxication, including his reliance on the information he received from fellow officers and a video recording of his interactions with Meehan.

Rideau is distinguishable in several respects; the plaintiff in that case was more obviously intoxicated than Meehan was, and the police officers searched the plaintiff on the basis of his intoxication but did not arrest him until after they discovered that he was carrying a firearm. Nonetheless, Rideau suggests that it is reasonable for police officers, acting as community caretakers, to seize at least some intoxicated individuals on public roadways.

In response to Rideau, Meehan cannot cite a single successful challenge to the arrest of an intoxicated individual based on the unreasonableness of a police officer's inference that the individual presented a danger to herself or others. Instead, Meehan is left to argue that the inference of danger in her case is not as strong as in cases where seizures were upheld as valid exercises of the community caretaker function. See Winters, 254 F.3d at 764; United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993); Rideau, 949 F.2d at 720; United States v. Wallace, 889 F.2d 580, 582 (5th Cir. 1989). Because all of these cases involve constitutional seizures, they do not clearly establish the point at which the governmental interest in ensuring the safety of an intoxicated individual becomes too attenuated to support a seizure. Although "there is no requirement that the very action in question has previously been held unlawful," Vaughn v. Roff, 253 F.3d 1124, 1129 (8th Cir. 2001), Meehan's failure to present any case in which analogous conduct by a police officer has been held unlawful casts doubt onto the clarity of the law at the time of her arrest. See Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

Further complicating the issue are cases in which qualified immunity has been denied to a police officer because of the officer's failure to arrest an intoxicated individual. See Kneipp v. Tedder, 95 F.3d 1199, 1211 (3d Cir. 1996); Reed v. Gardner, 986 F.2d 1122, 1127 (7th Cir. 1993). In Kneipp, police officers permitted a severely intoxicated woman to walk a third of a block to her home and left the

scene. 95 F.3d at 1203. The woman passed out in a ditch and suffered hypothermia and brain damage, and the Third Circuit denied qualified immunity to the police officers. Id. at 1211. In Reed, police officers arrested the driver of a car and permitted the intoxicated passenger to remain with the vehicle. 986 F.2d at 1123-24. The passenger then assumed control of the vehicle and took police on a high speed chase that ultimately resulted in a fatal car crash. Id. The family of the deceased sued the officers, and the Seventh Circuit denied qualified immunity. Id. at 1127.

These cases illustrate the fine line that police officers must walk in dealing with intoxicated individuals. Police officers are often constitutionally obligated to care for those individuals, and because alcohol can have disparate effects on different people, police officers must be given some latitude in evaluating whether an intoxicated individual can properly care for herself. Had Thompson permitted Meehan to walk home or to Lund's, he would have risked exposing himself to exactly the same kind of civil liability that Meehan asserts in this case. "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." Pierson v. Ray, 386 U.S. 547, 555 (1967). That principle is especially relevant in this context, where police officers face constitutional obligations on both sides. See Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("Th[e] accommodation for reasonable error [in a qualified immunity analysis] exists because 'officials should not err always on the side of caution' because they fear being sued." (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984))).

There are, of course, instances in which we have granted qualified immunity to police officers who declined to arrest a moderately intoxicated individual. See, e.g., Gladden, 2014 WL 3608521, at *5-7; Gregory v. City of Rogers, Arkansas, 974 F.2d 1006, 1012 (8th Cir. 1992). These cases articulate the general rule that, under the Fourteenth Amendment, a police officer is not constitutionally obligated to arrest an intoxicated individual unless a "special relationship" exists between the officer

-12-

and the individual. See Gregory, 974 F.2d at 1010. Such a relationship may arise when, for instance, a police officer affirmatively places an individual in danger; in that case, the officer is constitutionally obligated to help extricate the individual from the dangerous situation. See id.

But there are circumstances in which an arrest remains necessary "to ensure the safety of the public and/or the individual," Winters, 254 F.3d at 763, even when no special relationship exists between the officer and the individual. In these circumstances, a police officer has the discretion, but not the obligation, to arrest an intoxicated individual. Thompson was firmly within this zone of discretion when he arrested Meehan; that he was not obligated to arrest Meehan under the Fourteenth Amendment does not mean that he was not justified in doing so under the Fourth Amendment.

Finally, we note that a Minnesota "emergency admission" statute gives a police officer the discretion to transport an intoxicated but harmless individual either to her home or to a treatment facility:

> A peace or health officer or a person working under such officer's supervision, may take a person who is believed to be chemically dependent or is intoxicated in public into custody and transport the person to a treatment facility. If the person is intoxicated in public or is believed to be chemically dependent and is not in danger of causing self-harm or harm to any person or property, the peace or health officer may transport the person home.

Minn. Stat. § 253B.05, subd. 2(a). While this statute does not override Meehan's Fourth Amendment rights, it illustrates that, at the time of Meehan's arrest, a reasonable officer in Thompson's shoes could have believed that her arrest was legal. See Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1251 (10th Cir. 2003) ("In considering the 'objective legal reasonableness' of [a government official's] actions,

-13-

one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question."); Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir. 1994) ("[T]he existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional.").[3]

We thus cannot say that Thompson violated Meehan's clearly established constitutional rights in transporting her to a detox facility, for the state of the law was not so clear that a reasonable officer would have known that such an arrest violated Meehan's constitutional rights.[4]

---

[3]It is true, of course, that public drunkenness is not a crime in Minnesota. See Minn. Stat. § 340A.902 ("No person may be charged with or convicted of the offense of drunkenness or public drunkenness."). As discussed above, however, the arrest of an intoxicated individual under the community caretaker function is motivated by considerations that are "wholly unrelated to a desire to prosecute for crime." Terry v. Ohio, 392 U.S. 1, 13 (1968). Thus, the fact that no criminal liability attaches to public drunkenness in Minnesota does not mean that Thompson had no basis to arrest Meehan.

[4]We pause here to address another of Meehan's arguments that, while not explicitly articulated, seems to permeate her brief on appeal: that even if Thompson had probable cause to arrest Meehan in his capacity as community caretaker, he violated her Fourth Amendment rights by transporting her to a detox center ten miles away without first giving her a reasonable opportunity to find a ride to her home ten blocks away.

The Constitution generally does not give citizens an affirmative right to police assistance. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989). Once Thompson had probable cause to arrest Meehan, he was not constitutionally required to consider the proximity of her home in effecting that arrest, nor was he constitutionally required to wait for her to procure a ride.

B.

Meehan next asserts that Thompson's frisk constituted an illegal search in violation of the Fourth Amendment. Because the district court characterized Meehan's challenge to the frisk as an excessive force claim, we also analyze whether Thompson's frisk constituted excessive force.

1.

Meehan argues that Thompson's frisk violated her Fourth Amendment rights because he did not reasonably suspect that she was armed and dangerous. See Terry, 392 U.S. at 27. Meehan has confused a Terry frisk with a search incident to an arrest. A Terry analysis would be appropriate if Thompson had no lawful basis to arrest Meehan; in that scenario, Thompson would have to provide some additional justification for searching her. But as discussed above, Meehan's intoxication gave Thompson at least arguable probable cause to arrest Meehan for her own safety, and "a search incident to [an] arrest requires no additional justification." United States v. Robinson, 414 U.S. 218, 235 (1973).

2.

Meehan also argued to the district court, and the district court concluded, that Thompson used excessive force in frisking Meehan. Meehan does not dispute that Thompson's frisk caused only *de minimis* injury. This fact is fatal to Meehan's excessive force claim because, at the time of her arrest, it was not clearly established that conduct by a police officer that caused only *de minimis* injury could constitute excessive force.

We recognized for the first time in Chambers v. Pennycook, 641 F.3d 898 (8th Cir. 2011), that police conduct that causes only *de minimis* injury could constitute

-15-

excessive force. We noted, however, that it had previously "remain[ed] an open question in this circuit whether an excessive force claim requires some minimum level of injury." Id. (quoting Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005)).

Chambers was handed down on June 6, 2011, more than a month after Meehan was arrested. Meehan thus cannot avail herself of the legal principle articulated in Chambers. Meehan argues, however, that the law was clearly established even before Chambers that *de minimis* injury could give rise to an excessive force claim. Meehan notes that Chambers was the result of an en banc rehearing granted in part because of the petitioner's assertion that the original panel's holding—that *de minimis* injury could not support an excessive force claim—conflicted with a 2010 Supreme Court case, Wilkins v. Gaddy, 559 U.S. 34 (2010). Wilkins, however, dealt with a prisoner's right to be free from excessive force under the Eighth Amendment and did not clearly establish that *de minimis* injury could support an excessive force claim under the Fourth Amendment. Chambers's holding was not based on Wilkins but on an exhaustive study of case law, a study that no reasonable police officer should have been expected to conduct. See Davis v. Scherer, 468 U.S. 183, 196 (1984) ("[Police officers] are subject to a plethora of rules, 'often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively.'" (quoting Peter H. Schuck, Suing Government 66 (1983))). Meehan does not point to any other specific case enunciating the principle that *de minimis* injury can give rise to an excessive force claim, nor can we find one. See LaCross v. City of Duluth, 713 F.3d 1155, 1159 (8th Cir. 2013) (recognizing that the law on this point became clear only after Chambers was handed down). Because the law was not clear before Chambers that police conduct could constitute excessive force even if it caused only *de minimis* injury, Meehan's excessive force claim must fail.

## III.

Lastly, we address Meehan's state-law battery and false imprisonment claims. We hold that Thompson is entitled to official immunity from these claims.

"[U]nder Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion[,] . . . [unless] the officer acted maliciously or willfully." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). Malice involves the commission of a wrongful act that the police officer knows or has reason to know is prohibited. State ex rel. Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571 (Minn. 1994). This determination involves "a subjective standard, in contrast to the objective qualified immunity standard." Nelson v. County of Wright, 162 F.3d 986, 991 (8th Cir. 1998).

"Previously, we have rejected attempts to enter truncated orders that did not provide a 'thorough determination of [the defendant's] claim of . . . immunity.'" Jones v. McNeese, 675 F.3d 1158, 1162 (8th Cir. 2012) (quoting O'Neil v. City of Iowa City, Iowa, 496 F.3d 915, 918 (8th Cir. 2007)). The district court concluded that Thompson was not entitled to official immunity because "viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find that Defendant did in fact frisk Plaintiff, and that Defendant knew or should have known that his actions in frisking [and arresting] Plaintiff—whom he, by his own admission, did not suspect of criminal activity—were without justification." D. Ct. Order of July 2, 2013, at 13.

As we explained above, however, a reasonable officer would not have known that arresting and frisking Meehan would have violated her constitutional rights. Moreover, Meehan has presented no specific evidence that Thompson himself actually knew that he was violating her constitutional rights. See Semler v. Klang, 743 N.W.2d 273, 279 (Minn. Ct. App. 2007) ("Mere allegations of malice are not

-17-

sufficient to support a finding of malice, as such a finding must be based on specific facts evidencing bad faith."). Indeed, Thompson provided uncontroverted testimony that it was standard practice to transport intoxicated individuals to detox facilities. With no specific evidence that Thompson acted with malice, we hold that he is entitled to official immunity.

## IV.

The judgment of the district court is reversed, and the case remanded for the entry of judgment dismissing Meehan's complaint.

_____