**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 16, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANDRE GILMORE,

Defendant - Appellant.

No. 14-1088

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:13-CR-00034-WJM-1)**

Madeline S. Cohen, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the District of Colorado, appearing for Appellant.

Catherine M. Gleeson, Assistant United States Attorney (John F. Walsh, United States Attorney, and Robert Mark Russel, Assistant United States Attorney, on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.

Before **HARTZ**, **MATHESON**, and **MORITZ**, Circuit Judges.

**MATHESON**, Circuit Judge.

On January 13, 2013, police officers responded to a report of a disoriented person in an exhibitor parking lot at the National Western Stock Show in Denver. Upon arriving at the lot, the officers located Andre Gilmore, briefly questioned him, and conducted a pat-down search as part of taking him into protective custody. The search revealed a firearm in Mr. Gilmore's waistband. He was subsequently charged as a felon in possession in violation of 18 U.S.C. § 922(g)(1).

Mr. Gilmore moved to suppress evidence of the firearm, arguing the search violated the Fourth Amendment because the officers lacked probable cause to believe he was a danger to himself or others. After holding an evidentiary suppression hearing, the district court denied the motion. Mr. Gilmore appeals that determination. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  **BACKGROUND**

### A.  *Factual Background*

On the morning of January 13, 2013, Mr. Gilmore used an exit driveway to walk into Parking Lot C at the National Western Stock Show in Denver, Colorado. As Mr. Gilmore entered, a lot attendant, Jason Morris, greeted him and asked how he was doing. Mr. Gilmore did not respond. Mr. Gilmore was staggering and appeared intoxicated to Mr. Morris. A second attendant, Richard Gomez, observed Mr. Gilmore to be staggering or swerving, mumbling to himself, and apparently intoxicated. Mr. Gomez also noted

that unlike exhibitors in Lot C—a fenced-in lot adjacent to a cattle tie-out area[1]—Mr. Gilmore was not wearing a badge and was not dressed in rancher-style clothing. After following Mr. Gilmore as he walked into the tie-out area, Mr. Gomez contacted Vincent Garcia, a security guard in Lot C, who reported Mr. Gilmore's presence to his supervisor. Shortly thereafter, a police dispatcher broadcast a brief description and location of Mr. Gilmore, describing him as a suspicious party who was disoriented.[2]

Lieutenant Vincent Gavito and Sergeant Dino Gavito were working at the Stock Show and went to Lot C.[3] The officers spoke to Mr. Garcia, who had seen Mr. Gilmore in the lot and told the officers Mr. Gilmore appeared "very disoriented" and "obviously out of it." ROA, Vol. 3 at 72, 98. By this time, Mr. Gilmore had walked to the north end of the tie-out area, which was closed off by a fence. The officers drove through the parking lot entrance and parked their unmarked police car facing Mr. Gilmore, who began walking toward the tie-out area entrance where they were waiting.

When the officers encountered Mr. Gilmore, he was wearing a dark red overcoat

---

[1] The cattle tie-out area is "a fenced off area where [exhibitors] put the overflow cattle to bed them down at night." ROA, Vol. 3 at 72.

[2] Several thefts from vehicles had occurred in Stock Show parking lots in the days prior, although none had occurred in Lot C.

[3] Lt. Gavito and Sgt. Gavito are brothers.

over another dark coat,[4] dark jeans, and tennis shoes, carrying a cloth briefcase over his shoulder, and holding a small plastic bag and a large white jawbreaker in his hands. He was staring blankly into the air; having difficulty focusing; walking in a meandering, unsteady fashion; and did not appear to recognize the officers' presence. Lt. Gavito's first impression upon seeing Mr. Gilmore was that he was a candidate for protective custody due to his apparent level of intoxication.

The officers, who were both wearing uniforms, exited their car and approached Mr. Gilmore. Lt. Gavito asked Mr. Gilmore if he was all right and what he was doing in the lot. Mr. Gilmore turned and looked at Lt. Gavito, apparently registering his presence for the first time, but did not respond. Lt. Gavito told Mr. Gilmore to put down the items in his hand, and Mr. Gilmore complied. Lt. Gavito identified himself as a police officer and repeated his question to Mr. Gilmore, asking what he was doing in the lot. Mr. Gilmore mumbled an incoherent answer.

Lt. Gavito then asked Mr. Gilmore if he had any weapons. When Mr. Gilmore did not answer, Lt. Gavito conducted a pat-down search of his outer clothing. Lt. Gavito felt what he believed to be the butt of a handgun under Mr. Gilmore's coat. He lifted the coat, saw a pistol, and seized it from Mr. Gilmore's waistband. The officers arrested him for possessing a firearm while intoxicated in violation of Colorado Statute § 18-12-

---

[4] The district court determined Mr. Gilmore's two coats "were not inappropriate for the weather," which was approximately six degrees Fahrenheit. ROA, Vol. 1 at 53.

106(d). The officers handcuffed Mr. Gilmore, placed him in their car, and drove him to the Stock Show security office. On the way to the office, Lt. Gavito asked Mr. Gilmore his name, which Mr. Gilmore provided.

At the security office, the officers asked Mr. Gilmore for his birthday and used the information to access his criminal history records. They discovered he had a prior felony conviction that prohibited him from possessing a firearm. Because Mr. Gilmore was incoherent and was in and out of consciousness, the officers did not try to interview him at this time. He was instead transported to the Denver Detention Center and interviewed the following day.

## B. *Procedural Background*

A federal grand jury charged Mr. Gilmore with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Before trial, Mr. Gilmore filed a motion to suppress the gun seized during the pat-down search, arguing the officers lacked reasonable suspicion to believe he was armed and dangerous. The district court held an evidentiary hearing on the motion. At that hearing, the Government presented six witnesses: Mr. Morris, Mr. Gomez, Mr. Garcia, Lt. Gavito, Sgt. Gavito, and David Gallegos.[5] Mr. Gilmore did not call any witnesses.

Based on the testimony presented at the hearing, the district court denied Mr.

---

[5] Mr. Gallegos is a police officer who interviewed Mr. Gilmore the day after Lt. Gavito arrested him.

Gilmore's motion to suppress. The court determined the evidence did not support a reasonable, particularized suspicion that Mr. Gilmore was armed and dangerous and the pat-down search was not justified on those grounds. The court also determined, however, that Lt. Gavito had probable cause to take Mr. Gilmore into protective custody for detoxification under Colorado's Emergency Commitment statute, and therefore acted reasonably in frisking Mr. Gilmore for weapons before taking him into custody. Colo. Rev. Stat. § 27-81-111(1)(a).[6]

After the district court denied his motion, Mr. Gilmore signed a plea agreement and statement of facts relevant to sentencing. He entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. The district court sentenced him to 28 months in prison. He timely appealed.

## II. DISCUSSION

On appeal, Mr. Gilmore challenges the denial of his motion to suppress. He

---

[6] Colorado's Emergency Commitment statute states in pertinent part:

When a person is intoxicated or incapacitated by alcohol and clearly dangerous to the health and safety of himself, herself, or others, he or she shall be taken into protective custody by law enforcement authorities or an emergency service patrol, acting with probable cause, and placed in an approved treatment facility. If no such facilities are available, he or she may be detained in an emergency medical facility or jail, but only for so long as may be necessary to prevent injury to himself, herself, or others or to prevent a breach of the peace.

Colo. Rev. Stat. § 27-81-111(1)(a).

argues the district court erred by concluding the officers had probable cause to believe he was a danger to himself based on factual findings regarding (1) his degree of intoxication, (2) the dangerousness of the surrounding area, and (3) the danger posed by the cold weather. Mr. Gilmore concedes that if the officers had probable cause to believe he was a danger to himself, they were permitted to conduct a pat-down search before taking him into protective custody.

The Government contends the officers could reasonably believe Mr. Gilmore was a danger to himself. It argues in the alternative the pat-down search was justified because the officers had probable cause to arrest Mr. Gilmore for third-degree criminal trespass.

Based on the facts established at the suppression hearing, we conclude the officers had probable cause to believe Mr. Gilmore was a danger to himself. Accordingly, we need not reach the Government's argument that the officers also had probable cause to arrest Mr. Gilmore for third-degree criminal trespass.

### A. *Standard of Review*

In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the Government and accept the district court's factual findings unless clearly erroneous. *See United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011). We review de novo the ultimate determination of the reasonableness of a search or seizure under the Fourth Amendment. *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007).

### B. *Legal Background*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is for "community caretaking functions," which are police actions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Under this exception, "a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).

We have recognized the community caretaking function allows police officers to perform investigatory seizures of intoxicated persons. *See United States v. Garner*, 416 F.3d 1208, 1213-15 (10th Cir. 2005) (observing the community caretaking function allows officers to detain intoxicated individuals who pose a hazard to themselves or others); *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1029 n.4 (10th Cir. 1997) (determining the community caretaking function permitted officers to detain an apparently intoxicated citizen). To ensure community caretaking comports with the Fourth Amendment, we have emphasized officers must first have probable cause to take

-8-

an individual into protective custody. "[T]o justify seizure for intoxication by alcohol, an officer must have probable cause to believe an intoxicated person is a danger to himself or others." *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591 (10th Cir. 1999). The determination of probable cause "is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe," in this context, that the individual posed a danger to himself or others. *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007).

## C. *Analysis*

When assessing whether an intoxicated person is a threat to himself or others, a totality of the circumstances analysis must consider the person's degree of impairment as well as potential threats in the surrounding environment. Considering these factors together, and construing the uncontroverted facts in the light most favorable to the Government, we agree with the district court that the officers had probable cause to believe Mr. Gilmore was a danger to himself.

### 1. **Mr. Gilmore's Intoxication**

On appeal, Mr. Gilmore asserts there is no evidence about his level of intoxication other than witness testimony that he appeared intoxicated, was walking in a meandering manner, and was staring into space. He also asserts there is no evidence suggesting his reaction time and powers of observation were significantly impaired because he reacted when Lt. Gavito first spoke to him and complied with Lt. Gavito's request to put down his briefcase and candy.

In determining whether Mr. Gilmore was sufficiently intoxicated so as to constitute a threat to himself, however, an officer may consider a variety of factors. "Probable cause only requires a probability of . . . activity, not a prima facie showing of such activity." *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007) (articulating the probable cause standard in a Fourth Amendment case concerning an officer's assessment of an individual's degree of intoxication). Although the officers here did not use a breathalyzer or blood draw test to establish intoxication, other facts available to officers may suffice for them to determine an individual is intoxicated. *See United States v. Chavez*, 660 F.3d 1215, 1224 (10th Cir. 2011). In light of the uncontroverted witness testimony and facts established at the suppression hearing, we conclude the officers had probable cause to believe Mr. Gilmore was sufficiently intoxicated so as to pose a danger to himself.

First, the officers could reasonably believe Mr. Gilmore was intoxicated based on his behavior. The dispatcher informed the officers before they arrived that Mr. Gilmore was a suspicious party who appeared disoriented. When the officers arrived at the lot, Mr. Garcia told the officers Mr. Gilmore appeared "very disoriented" and "obviously out of it." ROA, Vol. 3 at 72, 98. The officers' own observations during their interactions with Mr. Gilmore confirmed this assessment. Lt. Gavito testified Mr. Gilmore "was having a difficult time focusing," "[h]e was kind of staring off into the air," "he wasn't walking with purpose, in a straight line," "he was kind of meandering," and "his balance was not very steady." ROA, Vol. 3 at 77. When the officers tried to engage Mr.

Gilmore, he was unable to respond coherently to basic questions regarding whether he was all right, what he was doing in the area, and whether he had a weapon.

These conditions led Lt. Gavito to conclude Mr. Gilmore "was definitely under the influence of alcohol or drugs, or something."[7] ROA, Vol. 3 at 78. Mr. Gilmore questions the degree of his impairment, but the district court's factual findings that Mr. Gilmore was gazing into space, staggering, unsteady, and unable to respond to simple questions were enough to establish a reasonable belief Mr. Gilmore was sufficiently intoxicated for protective custody. *See Qian v. Kautz*, 168 F.3d 949, 954 (7th Cir. 1999) (concluding an officers' observations of general indicators of intoxication "(*e.g.*, slurred speech, unsteadiness, etc.)" may be sufficient for officer to reasonably determine a person is intoxicated even though specific indicators "(*e.g.*, smell of alcohol, bloodshot eyes, failed sobriety tests, etc.)" are lacking); *United States v. Luginbyhl*, No. 06-CR-0206-CVE, 2007 WL 2579622, at *2 (N.D. Okla. Aug. 8, 2007) (determining an officer was permissibly exercising the community caretaking function by stopping a person who appeared to be under the influence of drugs or had a mental illness but who "did not

---

[7] We do not understand Mr. Gilmore to be arguing he was sober at the time of his interaction with the officers. On appeal, Mr. Gilmore argues only that the officers did not have probable cause to believe he was sufficiently intoxicated so as to pose a danger to himself. *See* Oral Arg. at 2:45 (suggesting we do not know whether Mr. Gilmore was intoxicated); Oral Arg. at 7:20 (recounting the officers' testimony and concluding "[t]hese facts suggest that he may have been intoxicated or experiencing some other problem of perception, but they did not justify immediately proceeding to, 'we're taking you to detox'").

-11-

display any physical signs of intoxication [and] did not stumble or slur his speech.").[8]

Second, it was reasonable for the officers to determine Mr. Gilmore's perception and reaction time were impaired. When the officers, who were both wearing police uniforms, exited their vehicle and initially encountered Mr. Gilmore, he did not appear to notice their presence. Then, when Lt. Gavito approached him, Mr. Gilmore still did not appear to register his presence until Lt. Gavito greeted him and asked if he was all right. This evidence could lead a reasonable officer to believe Mr. Gilmore's perception was limited. *See Edwards v. Bray*, 688 F.2d 91, 92 (10th Cir. 1982) ("Intoxication increases reaction time and reduces speed of motor responses, including those of auditory discrimination and judgment.") (citing 4 Gray, Attorney's Textbook of Medicine, P 133.51 (3d ed. 1981)).

The officers' determination that Mr. Gilmore was intoxicated and had impaired perception informed their assessment that Mr. Gilmore was at risk. *Meehan v.*

---

[8] The Colorado Supreme Court has recognized officers' discretion under the Emergency Commitment statute:

> Under section 25-1-310(1), it is the *officer* who must determine whether the intoxicated person is clearly dangerous. The General Assembly plainly did not intend for the police to take into protective custody every intoxicated person they meet. Instead, the General Assembly designated a specific class of intoxicated persons who are subject to emergency commitment and left the determination of whether a particular individual is clearly dangerous to the police.

*Leake v. Cain*, 720 P.2d 152, 164 (Colo. 1986).

-12-

*Thompson*, 763 F.3d 936, 944 (8th Cir. 2014) ("Police officers are often constitutionally obligated to care for [intoxicated] individuals, and because alcohol can have disparate effects on different people, police officers must be given some latitude in evaluating whether an intoxicated individual can properly care for herself.").

2. **Environmental Factors**

Mr. Gilmore additionally argues the Government offered no witness testimony that the surrounding environment placed him in danger. He contends the Stock Show area was not dangerous. He notes the district court observed the two coats he was wearing were "not inappropriate for the weather." ROA, Vol. 1 at 53.

We do not look at the surrounding environment in a vacuum; in the totality of the circumstances analysis, we consider the threat it might pose to somebody in Mr. Gilmore's position. Conditions that may not pose a danger to a sober individual may be treacherous to someone who is disoriented, intoxicated, or otherwise impaired. *See Meehan*, 763 F.3d at 942 ("[A] person's intoxication may exacerbate the other potential hazards of her environment, such as the late hour and her location on a public roadway, and may impair her ability to recognize these hazards."); *People v. Dandrea*, 736 P.2d 1211, 1212-13 (Colo. 1987) (observing a stop and frisk of an intoxicated person prior to protective custody was conducted because "the day was extremely cold" and the person was stopped "on an isolated mountain road"). Here, the record supports the officers' reasonable belief that Mr. Gilmore was at risk in the Stock Show's environs.

First, although there was no witness testimony that the neighborhood surrounding

-13-

the Stock Show placed Mr. Gilmore in immediate danger, there was testimony that the surrounding neighborhood was dangerous. Lt. Gavito testified the neighborhood surrounding the Stock Show was "very predominant with gang members" and "a lot of gang activity," and he testified that in his years working at the Stock Show he had numerous encounters with unauthorized weapon possession.[9] ROA, Vol. 3 at 81-82. Witnesses also testified car thefts had occurred in the adjoining lots. A reasonable officer could believe Mr. Gilmore could be harmed if he wandered disoriented into one of the surrounding neighborhoods or areas carrying a briefcase.

Second, Mr. Gilmore argues nothing in the record established the presence of cattle in the tie outs or heavy or high-speed traffic in Lot C or its vicinity that would place him in danger. We agree with Mr. Gilmore that there was no evidence of cattle in the tie outs or high-speed traffic in Lot C at the time he was arrested. But the officers could have reasonably believed if Mr. Gilmore wandered into another area of the Stock Show or an area outside of the Stock Show with high-speed traffic, he could have been struck by a car given his impaired state. *See Dandrea*, 736 P.2d at 1212.

Finally, although the court determined Mr. Gilmore's dress was seasonally appropriate, the officers could have reasonably believed if Mr. Gilmore were to become unconscious in a remote area or fail to find shelter when the temperature dropped that

---

[9] Lt. Gavito had been employed at the Stock Show since 1998.

evening, [10] he could suffer serious injury or death. Weather that would not be dangerous to a properly dressed and sober individual can become dangerous when that person is intoxicated. *See Gladden v. Richbourg*, 759 F.3d 960, 966 (8th Cir. 2014) ("Circumstances that are harmless to a sober person may be dangerous to one who is severely intoxicated or otherwise incompetent. Bitterly cold weather is one such circumstance: while most people can be expected to navigate cold weather to find an indoor shelter, an intoxicated person may lack this capacity."); *Dandrea*, 736 P.2d at 1212-13. The district court observed Mr. Gilmore's two coats were "not inappropriate for the weather," ROA, Vol. 1 at 53, but this does not mean Mr. Gilmore was fully protected from the elements. Clothing that might be sufficient for a mid-day walk does not necessarily provide sufficient protection over extended periods of exposure in severe cold.

\* \* \* \*

We conclude the totality of the circumstances could lead a reasonable officer to conclude Mr. Gilmore was a danger to himself because he appeared to be severely intoxicated to the point of impairment and he was in an environment that posed significant risks to an impaired individual. We stress that our holding is narrow and highly fact-dependent. Officers must have probable cause to take an individual into

---

[10] The Government's exhibits showed that on the day Mr. Gilmore was arrested, the temperature ultimately dropped to negative ten degrees Fahrenheit. [Aplee. Ex. D at 1.]

protective custody, and Mr. Gilmore only contests whether the facts support the officers' determination that he was a danger to himself.  Based on uncontroverted testimony indicating Mr. Gilmore was highly unresponsive in an unforgiving environment with considerable risks to his safety, we conclude it was within the scope of the officers' community caretaking function to ensure he was safe from harm.

## III.  **CONCLUSION**

For the foregoing reasons, we affirm the district court.