**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

STEVEN ALEX HUGHART,

     Defendant - Appellant.

No. 15-7038
(D.C. No. 14-CR-00061-JHP-1)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **GORSUCH**, and **MORITZ**, Circuit Judges.[**]

Steven Alex Hughart entered a conditional guilty plea to one count of being

a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and one

count of possessing a firearm with a removed, obliterated, or altered serial

number in violation of §§ 922 (k) & 924(a)(1)(B). In his plea, Mr. Hughart

preserved the right to appeal the district court's denial of his motion to suppress

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

evidence obtained in violation of the Fourth Amendment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

The basic facts are undisputed.[1] On a February afternoon in 2014, an anonymous caller reported a domestic disturbance to police in the area of an apartment complex at 501 East Peak Boulevard in Muskogee, Oklahoma. Officer Nicholas Ford, a seven-year veteran of the police department, was sent to investigate the call. As the officer was driving to the apartment complex, which sits along a two-lane frontage road, he saw a car stopped in the eastbound lane of the frontage road with a man behind the wheel and two women standing near the car, one at the driver's side door and the other by the curb. The woman nearest to the driver was upset and crying, and the officer testified that she appeared to be arguing with the driver. As he pulled up to the stopped car, the women began to walk away and the car began to move. Neither woman had obvious injuries or torn clothing.

The officer stopped in the westbound lane alongside the car and asked the

---

[1] The facts are culled from the magistrate judge's findings and recommendation, the video recording of the encounter, and the officer's testimony at the suppression hearing. Mr. Hughart challenges only two findings: (1) at what point the officer activated the emergency lights on his patrol car, see 1 R. 108–10, and (2) the characterization of Mr. Hughart's gesture near his waistband as "messing with his waistband," see id. at 113–15. Each is later discussed.

driver, later identified as Mr. Hughart, "Yo, what's going on?"  Video of Stop at

1:08, Response in Opposition to Motion to Suppress, attach. A, United States v.

Hughart, No. 14-cr-00061 (E.D. Okla. Jan. 5, 2015), ECF No. 28.  Mr. Hughart

responded, "Me and my wife are arguing."  Id. at 1:13.  Mr. Hughart explained

that he and his wife had a disagreement and he wanted to return the car to her.

He asked to pull over into a parking lot.  The officer replied by asking Mr.

Hughart for identification, but Mr. Hughart had none, saying that he left it at

home in the apartment complex.  At some point during this conversation, the

officer activated the patrol car's emergency lights.[2]

Believing this to be the reported dispute, the officer told Mr. Hughart to

pull into the westbound lane so as not to block traffic.  As Mr. Hughart moved his

car, the officer testified he noticed through the windshield that Mr. Hughart

moved his hand to his right side, near his waistband.[3]  When the officer exited his

car and resumed questioning Mr. Hughart, he testified that he again saw Mr.

Hughart move his hand to his right side near his waistband.

---

[2]  Mr. Hughart claims the emergency lights were activated at the very start of the encounter.  The magistrate judge merely indicated that the emergency lights were engaged "[a]t some point in the encounter."  1 R. 99.  The district court adopted the magistrate's findings and recommendation in its entirety.  Id. at 121.

[3]  The magistrate judge described Mr. Hughart as "messing with his t-shirt on the right side," see 1 R. 100, but Mr. Hughart disputes that characterization. We will instead depend on the officer's description of the gesture in his testimony at the suppression hearing.  See 2 R. 21.

He immediately told Mr. Hughart to step out of the car so he could "pat him down for weapons real quick." Id. at 2:03. As was his usual practice, the officer testified he placed Mr. Hughart's hands behind his back. Mr. Hughart pulled away, exclaiming, "What the fuck?" id. at 2:13, and, according to the officer, "took a defensive stance," 2 R. 24. The officer wrestled Mr. Hughart to the ground, kneed him several times during the struggle, and in the altercation, a chamber-loaded .380 Jimenez semi-automatic pistol with an obliterated serial number fell out of Mr. Hughart's waistband. Mr. Hughart was eventually subdued and arrested.

Mr. Hughart was charged with possessing a firearm as a felon and possessing a firearm with a removed, obliterated, or altered serial number. 18 U.S.C. §§ 922(g)(1), (k) & 924(a)(1)(B). 1 R. 10. Mr. Hughart filed a motion to suppress the recovered firearm, arguing that his Fourth Amendment rights were violated when he was seized and searched without legal cause. Id. at 12–18. After a suppression hearing, a magistrate judge recommended Mr. Hughart's motion to suppress be denied. Id. at 98–106. The district court adopted the magistrate's recommendation and denied Mr. Hughart's motion. Id. at 121. Reserving the right to appeal the ruling on suppression of evidence, Mr. Hughart pled guilty. Id. at 123. He was sentenced to 120 months' imprisonment and three years' supervised release. Id. at 140. This timely appeal follows.

## II. Standard of Review

When reviewing a denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment. United States v. Gilmore, 776 F.3d 765, 768 (10th Cir. 2015).

## III. Discussion

On appeal, Mr. Hughart challenges three aspects of his encounter with the officer, claiming his Fourth Amendment rights were violated when he was (1) seized without reasonable suspicion of criminal activity, (2) frisked without reasonable suspicion that he was armed and dangerous, and (3) frisked with excessive force.

Any analysis of a seizure begins by recognizing three types of interactions between police officers and suspects: consensual encounters, investigative detentions known as Terry stops, and arrests. See Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc).[4]  Consensual encounters are "simply the voluntary cooperation of a private citizen in response to non-coercive questioning." United States v. Guerrero-Espinoza, 462 F.3d 1302, 1308 (10th

---

[4]  These three encounters "are not static and may escalate from one to another." Cortez, 478 F.3d at 1115 n.5.

Cir. 2006) (quoting United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999).

On the other side of the spectrum, there are arrests, and falling somewhere in between consensual encounters and arrests, we have investigative detentions. While considered a seizure, an investigative detention does not need to be supported by probable cause; instead, it must only be justified by reasonable and articulable suspicion that the person stopped has committed a crime or is about to do so. United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir. 2010).

The Fourth Amendment protects individuals who are considered seized by constitutional standards—either detained in a Terry stop or arrested outright—from an unreasonable restraint on their liberty. Because consensual encounters are not seizures, they need not be supported by suspicion of criminal wrongdoing. Florida v. Royer, 460 U.S. 491, 497–98 (1983).

**A. Initial Encounter and Reasonable Suspicion**

With these categories in mind, we must first determine when Mr. Hughart was seized. Once Mr. Hughart was seized, we ask whether the officer had reasonable suspicion to support Mr. Hughart's investigative detention.

The magistrate judge correctly noted that the officer began the encounter by asking what was going on. Mr. Hughart explained the situation, suggesting he pull over into a nearby parking lot. The officer then asked him for identification, and when he learned that Mr. Hughart did not have any, he directed Mr. Hughart to pull his vehicle nose-to-nose with the officer's vehicle. This sequence of

events is completely consistent with the video of the encounter.

Relying on those findings and the magistrate's judge remark that the encounter began as an investigative detention, Mr. Hughart asserts that he was seized as soon as the officer pulled up alongside him. From that moment, a reasonable person, Mr. Hughart claims, would not have felt "free to leave." United States v. Pena, 920 F.2d 1509, 1515 (10th Cir. 1990).

The facts as found by the magistrate judge, however, suggest that any investigative detention did not begin until after Mr. Hughart admitted he lacked identification. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). We must look to all "the circumstances surrounding the encounter" and ask whether a reasonable person was "free to decline the officers' requests or otherwise terminate the encounter." Id. at 437–38. Certain circumstances can suggest a seizure, such as

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003) (quoting United States v. Hill, 199 F.3d 1143, 1147–48 (10th Cir. 1999)).

None of those are present here. Mr. Hughart was already stopped in the

- 7 -

eastbound lane of the two-lane road when the officer pulled up alongside him. See id. at 1173 ("Unlike the archetypical highway drug seizure that begins with a stop for some traffic violation, [officers] did not pull Defendants over on the Interstate."). Stopped in the road, Mr. Hughart was blocking traffic and talking with a woman who was visibly upset. Yet, the officer didn't get out of his patrol car; he didn't block Mr. Hughart's car or prevent him from leaving in any way; he didn't brandish his weapon; his tone wasn't accusatory, persistent or intrusive. Instead, the officer asked from his car window, "Yo, what's going on?"

Even so, Mr. Hughart points to three facts that he claims demonstrate a coercive encounter from the outset: the officer activated his emergency lights, requested his identification, and ignored his request to pull into the parking lot to give his wife the car. Under the totality of the circumstances, however, these facts do not transform the encounter into a seizure, especially when viewed in the light most favorable to the government. First, although the record does not conclusively reflect when the officer turned on his emergency lights, even if activated immediately, the lights were also a safety precaution to warn approaching motorists of stopped traffic, not a show of force toward Mr. Hughart. Remember, at this point, Mr. Hughart and the officer were blocking the road. Second, it is well-settled that requesting identification does not necessarily transform a consensual encounter into a seizure. I.N.S. v. Delgado, 466 U.S. 210, 216 (1984); United States v. Johnson, 364 F.3d 1185, 1188–89 (10th Cir. 2004).

Insofar as Mr. Hughart's request to pull his car into the apartment parking lot, that request went unanswered while the officer was attempting "to figure out what was going on." 1 R. 48. Under these circumstances, merely asking to park in a different place does not indicate a seizure from the outset.

Thus, we conclude that the encounter began as consensual. At the earliest, Mr. Hughart was seized when the officer directed Mr. Hughart to pull his car into the westbound lane in front of the patrol car. By this time Mr. Hughart admitted he had no identification, let alone a driver's license.

Mr. Hughart's seizure triggers our second inquiry: Did the officer have reasonable, articulable suspicion to justify Mr. Hughart's detention? The officer testified he had seen Mr. Hughart's car in motion and Mr. Hughart lacked identification. Thus, a reasonable officer would have reasonably suspected that Mr. Hughart had violated Oklahoma law by operating a vehicle without a license. See Okla. Stat. tit. 47, § 6-303(A); see also United States v. Cash, 733 F.3d 1264, 1274 & n.6 (10th Cir. 2013). That reasonable suspicion, on its own, was enough to justify Mr. Hughart's detention. There are certainly other factors that the magistrate judge relied on and the government argues factor into the calculus—the anonymous report of a domestic dispute in the area, Mr. Hughart's mid-lane stop, his conversation with a distraught woman in the road, his admission that he and his wife were arguing, and the officer's experience responding to domestic disturbances—but we need not go on because Mr.

Hughart's failure to produce a driver's license was sufficient.

**B. Frisk**

Next, Mr. Hughart argues that even if his detention was justified, his frisk was not, because the officer had no reason to believe that Mr. Hughart was armed and dangerous. As Mr. Hughart notes, a frisk is not the foregone conclusion of a lawful stop, and officers are required to have reasonable, articulable suspicion that an individual is armed and dangerous before performing a patdown for weapons. Terry v. Ohio, 392 U.S. 1, 27 (1968). The standard does not, however, require an officer be "absolutely certain" an individual is armed. United States v. Garcia, 459 F.3d 1059, 1063 (10th Cir. 2006). Considering the totality of the circumstances, we conclude the officer was justified in performing a patdown here.

The officer saw Mr. Hughart twice touch his right side near his waistband, a gesture the officer believed to be consistent with adjusting or concealing a weapon. After the second motion, the officer instructed Mr. Hughart to get out of his car in order to frisk him for weapons. Mr. Hughart's furtive movements, along with the officer's other observations, were enough to justify a frisk. See United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009) (citing United States v. Paulino, 850 F.2d 93, 98 (2d Cir. 1988), which concluded that "furtive movement provided a legal basis for the protective search"); see also United States v. Bullock, 510 F.3d 342, 348 (D.C. Cir. 2007). Those other factors

included: a report of a domestic disturbance, Mr. Hughart's admission he was arguing with his crying wife, and the officer's experience responding to such disputes.

Mr. Hughart asserts that even if we rely on his hand movement to find that the officer reasonably believed that Mr. Hughart was armed, there was no indication he was also presently dangerous. See United States v. House, 463 F. App'x 783, 788 (10th Cir. 2012) (noting that "[b]eing armed does not ineluctably equate with dangerousness"). In this nonprecedential case, police lacked any other indication that Mr. House was dangerous besides the glimpse of a knife; here, there were several other factors that could cause a reasonable officer to fear for his safety. Furthermore, we rejected this argument in United States v. Garcia, 751 F.3d 1139 (10th Cir. 2014), noting that while the armed and dangerous test is conjunctive, each element cannot be viewed in isolation because that would ignore the unavoidable interaction between them. Id. at 1143 n.7.

## C. Excessive Force

Mr. Hughart's final claim on appeal is that the officer exceeded the scope of a lawful frisk by employing excessive force. He maintains that the officer's grip on his wrists went beyond the de minimis intrusion permitted in a frisk.

Police officers can take reasonable and necessary measures "to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). Such measures can include

- 11 -

using handcuffs, drawing a weapon, or placing the suspect on the ground for the officers' protection. United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002). In each case, we ask whether the "quantum of force" applied was reasonable. United States v. Salas-Garcia, 698 F.3d 1242, 1250 (10th Cir. 2012).

When evaluated in light of our precedent permitting limited handcuffing during frisks—a far greater intrusion and a hallmark of arrest—the officer's brief restriction of Mr. Hughart's wrists was acceptable. Mr. Hughart twice reached for the area near his right waistband in the officer's presence. The only officer on the scene and faced with the possibility Mr. Hughart was reaching for a weapon, the officer applied temporary and minimal force to ensure his own safety during the frisk. The quantum of force applied here passes constitutional scrutiny.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge
